**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Carl D. SCHAEFER, Defendant-Appellant.**

**No. 13278.**

United States Court of Appeals Seventh Circuit.

Feb. 14, 1962.

Rehearing Denied March 16, 1962.

---

George B. Collins, Chicago, Ill., for appellant.

James P. O'Brien, U. S. Atty., Robert F. Monaghan, Asst. U. S. Atty., Chicago, Ill., for appellee.

John Peter Lulinski, John J. Quan, Asst. U. S. Attys., Chicago, Ill., Thomas S. Howard, United States Securities and Exchange Commission, Chicago, Ill., of counsel.

Before HASTINGS, Chief Judge, and KILEY and SWYGERT, Circuit Judges.

SWYGERT, Circuit Judge.

Defendant, Carl D. Schaefer, was indicted and convicted on ten counts of using the mails in the employment of a scheme to defraud in the offer and sale of securities proscribed by Section 17(a) (1) of the Securities Act of 1933, 15

**628**

U.S.C.A. § 77q(a) (1), and on two counts of using the mails to deliver an unregistered security proscribed by Section 5 (a) (2) of the Securities Act of 1933, 15 U.S.C.A. § 77e(a) (2). He was sentenced to one year's imprisonment on each count, the first six counts to be concurrent with the last six for a total of six years, and was further sentenced to a fine of $1,-000.00 on each count, for a total of $12,-000.00 in fines. Defendant appeals primarily on the ground that the trial court, sitting without a jury, erred (1) in convicting on certain counts when there was no proof that defendant made misrepresentations to the investor involved in those particular counts, and (2) in preventing two of defendant's witnesses from testifying because of their presence in the courtroom after imposition of a rule requiring sequestration of witnesses. The pertinent facts follow.

Defendant claims he has invented a machine which can create steam with such small expenditures of energy that he believes it may eventually make atomic power obsolete. According to his assertions the steam is created by the action of shock waves in an enclosed body of water. The shock waves are set up by means of revolving plates which cause friction inside the water-filled casing, thus turning the water into steam. Presumptively, the only need for energy is the power needed to rotate the plates and with this small energy requirement such a machine would be a most economical source of heat and power.

Many witnesses testified the machine did produce large quantities of steam when demonstrated at defendant's shop. However, a government witness testified to the effect that the steam was not hot. Defendant offered to demonstrate the capabilities of the invention in the courtroom but this was not allowed. The court accepted the government's position that the merits of the invention were not in issue since there was no charge that misrepresentations as to the operating characteristics and workability of the machine were a part of the scheme to defraud.

The indictment sets forth twenty-two allegedly false representations comprising the scheme to defraud. None of the representations relate to the workability or the merits of defendant's steam-generating machine. The misrepresentations charged in the indictment as comprising the scheme consist of statements made to prospective investors in certain securities, to-wit: "investment contracts and evidences of indebtedness relating to completing the development by the defendant of a machine for generating steam through hydraulic forces." The allegedly false statements include representations that a number of manufacturers, Dow Chemical Company, the du Pont Company, Chrysler Corporation and General Motors, among others, had formed a syndicate to purchase defendant's rights to his invention and had placed ten million dollars in escrow with the Chase National [sic]. Bank in New York City; that Fairbanks-Morse & Company and The Crane Company had each offered one million dollars for defendant's machine; and that the United States Navy was interested in buying defendant's machine.

The securities sold by these allegedly false representations consisted of contracts between the investors and defendant. By the terms of the contract the investor was assigned an interest, pro rata with other investors, in royalties and profits accruing to defendant as a result of the sale or lease of the patent rights to his invention. The investor's interest was limited to ten times his investment. When this ratio was reached the contract terminated. The contracts are securities within the meaning of the Securities Act of 1933, 15 U.S.C.A. § 77b.

Defendant admitted during the Securities and Exchange Commission's investigation prior to his being indicted that he had raised over $2,000,000 from several hundred investors. A number of these investors testified at the trial to misrepresentations and false pretenses made to them by the defendant. For example, defendant told one investor that the United States Navy wanted to buy

his machine for millions of dollars and that a syndicate, interested in buying his machine, and consisting of Dow Chemical Company, Union Carbide Company, General Electric Company, General Motors Corporation, and the du Pont Company, had placed ten million dollars in escrow with the Chase National Bank of New York City on May 5, 1954, and that on November 6, 1954, this money would be transferred to an account at the Bank of Wilmette where it would be paid out to investors at the ratio of $10.00 return for every $1.00 invested after deducting $2,500,000 for payment to the government as taxes.

To another investor defendant represented that The Crane Company had offered him one million dollars for his invention and to others that Fairbanks-Morse & Company had offered a like amount for his machine. To other prospective investors defendant said that the United States Navy had approved his machine and was going to use it in submarines; that General Electric Company or Western Electric Company wanted to buy his machine; that General Motors Corporation wanted to buy his machine for millions of dollars; that a syndicate was to pay five million dollars down payment to defendant for his invention and that in a few months from June, 1954, the investors would be repaid $10.00 for every $1.00 they had invested.

A stipulation was signed by defendant during the trial that, if called, the testimony of various company officials and persons about whom representations were made by defendant would be as follows: The Chase Manhattan Bank had never heard of defendant, his machine, or any escrow agreement relating thereto; Chrysler Corporation, General Motors Corporation, Dow Chemical Company and E. I. du Pont de Nemours & Company had never entered into dealings with defendant nor placed money in escrow to purchase a machine from defendant; the United States Navy had not heard of defendant nor dealt with him; and General Electric Company, Fairbanks-Morse, Western Electric, and The Crane Company had no contact with defendant and knew nothing of his machine.

Defendant's answer was that he did not make the misrepresentations or, if he did, he had relied on what others told him without checking the accuracy of the reports. This ignorance of facts is unavailing as a defense "where the defendant, by the exercise of due diligence, could have become aware of his mistakes, especially where others may suffer a loss by his misstatements." Stone v. United States, 6 Cir., 113 F.2d 70, 75.

Defendant complains the scheme was established primarily by testimony of victims who are not mentioned in the counts. This argument has been answered in Frank v. United States, 10 Cir., 220 F.2d 559, 563 where the court said, "Since it is the use of the mails in furtherance of the fraudulent scheme that is prohibited rather than fraud upon any recipient of materials sent through the mails, the testimony of a victim is admissible to prove the scheme to defraud even if there has been no use of the mails in defrauding that party." Thus, the existence of a fraudulent scheme was properly shown and the evidence was ample to prove its existence.

The crucial question is whether the government proved as charged in counts one to ten that defendant employed this scheme in the sale of the "ten for one" contracts by the use of the mails.

Clearly it is only when the mails are used in employing the scheme that the scheme becomes a federal crime. The use of the mails need not be central to the scheme but may be entirely incidental, United States v. Cashin, 2 Cir., 281 F.2d 669, and the mail need not contain fraudulent representations, Cresswell-Keith, Inc. v. Willingham, 8 Cir., 264 F.2d 76.

Nevertheless, we hold that in order to sustain a conviction the government must show some impact of the scheme on the investor and that the mails were used in those instances where the impact occurred. To state our holding

differently, even though a scheme to defraud in the sale of securities may have been devised and have been operative on certain investors, if a sale of these same securities would be legal absent the employment of the scheme and if the sales to those investors in which the use of the mails are charged is not tainted by the employment of the scheme, no offense has been proved. The statute is clear in this regard; the mail must be used *in employing* the scheme however incidental the mailing may be.

In the instant case the government contends the crime is established even though none of the alleged misrepresentations were made to the investors named in some of the counts. With this we cannot agree. The government has not challenged the workability of the machine and would not agree to its demonstration in court. Thus, we are forced to assume that any representations made as to the merits of the machine were not false. The investors fall into two classes: those to whom a fraudulent scheme was employed by way of misrepresentations as to financial backing and those to whom no such misrepresentations were made and who invested solely on the represented merits of the machine. In this case misrepresentations as charged in the indictment were essential in order to establish that the victim was one to whom the scheme was applied. If the machine itself were charged to be fraudulent and this had been proved, conviction on all counts would stand. Since this was not the charge, we must examine the evidence in the light of the foregoing analysis.

■ Conviction on counts one and ten of the indictment must be set aside since the government admitted no misrepresentation had been made to the investor Danielson and thus no connection has been established between the scheme and the alleged victim. Counts two, eight, and nine, involving investor Schmeling, and count seven, involving investor Lund are similar in that as far as can be determined from the record, representations which were made concerned defendant's opinion as to the capabilities of the machine. Schmeling said patents were mentioned but this is insufficient to show it was represented that patents had been obtained. Accordingly, conviction on counts two, seven, eight and nine also must be set aside.

Conviction on counts three, four, five, and six fall in a different category. Sufficient misrepresentations of the financial support behind the machine were made to investors Cohen and Dickinson to bring them in contact with the scheme and the later mailing, although containing no misrepresentations, was incidental to the scheme. It is of no consequence that both investors stated they invested solely on demonstrations of the machine. Counts four and five are similar in that investors Strege and Ito are both residents of California and their only contact with defendant was by way of correspondence with one Turney who contacted them on behalf of defendant. Since Turney testified he had passed misrepresentations made to him by defendant on to both Strege and Ito and that defendant knew he was contacting the alleged victims and approved, there is evidence of a connection between the scheme and the investors who mailed the money to defendant.

■ In regard to counts eleven and twelve, undeniably the contracts which were mailed to investors Stieve and Schmeling were securities within the meaning of the Securities Act of 1933, 15 U.S.C.A. § 77b, and they were admittedly unregistered. Defendant's only contention is that he acted in good faith on the advice of his lawyer thereby negating the element of criminal intent. Defendant's testimony is to the effect that his lawyer informed him the contracts did not have to be registered. The lawyer did not say the contracts were not securities. The law in this regard was well put in Linden v. United States, 4 Cir., 254 F.2d 560, 568, a mail fraud case. The court stated:

"That the defendants proceeded under advice of a lawyer is a fact to

be considered together with other facts in determining the question of defendant's good faith, but legal advice does not under all circumstances constitute an impregnable wall of defense. * * * To hold otherwise would be to say that no matter how violative of law a defendant's conduct may be, and regardless of consciousness of wrongdoing on his part * * * the advice confers immunity."

In the instant case, defendant's conduct in devising the fraudulent scheme must be considered in determining whether he wilfully failed to register the securities. It hardly seems likely that he would register the securities if he were selling pursuant to a fraudulent scheme. Accordingly, we hold that the evidence was sufficient for the District Court to find a violation of 15 U.S.C.A. § 77e(a) (2) as charged in counts eleven and twelve.

We come now to the question whether the trial judge abused his discretion in refusing to allow defendant's witnesses Krueger and Reed to testify. In the interest of brevity, we deem it sufficient to state that after a thorough study of the record we are convinced these witnesses were in the courtroom in violation of the court's order of sequestration. However, it appears that they did not wilfully violate the rule; likewise, there is no indication that their presence was with the consent, connivance, or knowledge of defendant or his counsel.

The most pertinent federal case which has been cited to us or which we have been able to locate is Holder v. United States, 150 U.S. 91, 92, 14 S.Ct. 10, 37 L. Ed. 1010. In Holder the Supreme Court held:

"If a witness disobeys the order of withdrawal, while he may be proceeded against for contempt, and his testimony is open to comment to the jury by reason of his conduct, he is not thereby disqualified, and the weight of authority is that he cannot be excluded on that ground, merely, although the right

to exclude under particular circumstances may be supported as within the sound discretion of the trial court."

The government cites several federal cases that are merely authority for the proposition that the decision whether to put the rule into effect is within the discretion of the court. They do not deal with the question of disqualification as a result of disobedience of the rule.

There are decisions which hold that it is within the trial court's discretion to allow a witness who has disobeyed the rule to testify, Coates v. United States, 9 Cir., 59 F.2d 173; People v. Gifford, 2 A.D.2d 634, 151 N.Y.S. 2d 980. It may be reasoned logically that the discretion cuts both ways. However, we interpret Holder to mean the court may not disqualify the witness merely because he disobeys the rule but that this alternative is available if particular circumstances are shown. From the better reasoned state court decisions we interpret these particular circumstances to mean some indication the witness was in court with "the consent, connivance, procurement or knowledge of the appellant or his counsel," Holstein v. Grier, Tex.Civ.App., 262 S.W.2d 954, 955; see also People v. Tanner, 77 Cal.App.2d 181, 175 P.2d 26, and 6 Wigmore, Evidence § 1842, Supp. at 120. Sequestration of witnesses is a great aid in eliciting the truth, but disqualification of the offending witness absent particular circumstances is too harsh a penalty on the innocent litigant. Accordingly, we hold it was error to exclude the witness from the stand.

The government argues that if it were error it is not reversible error since no offer of proof was made. Answering this contention, we hold that if the record sufficiently reveals that the excluded witness' testimony would have been relevant in resolving a material issue of fact in the case, then an offer of proof was unnecessary to show prejudicial error. People v. Duane, 21 Cal.2d 71, 130 P.2d 123. But the corollary prop-

osition is also true. If there is insufficient revelation in the record or if there is doubt, then in order to take advantage of the error it was defendant's duty to make an offer of proof so as to apprise the trial court as well as the reviewing court as to the relevancy and materiality of the excluded testimony. Accordingly, in order to determine the question of prejudicial error, it becomes necessary to examine the record with the foregoing propositions in mind. This we have done and our conclusions follow.

Defendant testified that some of the misrepresentations regarding the financial interest of the Navy and large private corporations in his steam-generating machine had their origin in what others had told him while Krueger or Reed was present. Whether this testimony would have been corroborated by Krueger and Reed is immaterial because of our view that defendant's claimed reliance on what others may have told him about the financial backing for his machine is unavailing as a defense in the absence of any effort by him to check the accuracy of such representations.

■ Whether it was prejudicial error to bar the testimony of Krueger and Reed with specific reference to counts one, two, seven, eight, nine and ten is immaterial since conviction on these counts must be set aside for reasons already stated. With respect to counts three and six, we conclude that there was no showing that either Krueger or Reed was present when the misrepresentations were alleged to have been made. Thus, it is not obvious from the record that their testimony would have been relevant and material. An offer of proof was therefore essential.

■ The record shows with respect to counts four and five that Krueger may have been present during several conversations between defendant and Turney. It was during these conversations that defendant allegedly made false statements pertaining to the financial backing of his invention and statements regarding Turney's authority to solicit contracts. Defendant denied he had any knowledge or reason to believe that Turney was writing anyone concerning the machine, and stated he had never authorized Turney to make representations concerning the machine. It thus appears from the record that Krueger's testimony was relevant and material because of the discrepancy in the testimony of defendant and Turney. Therefore, the error in failing to permit Krueger to testify was prejudicial as to counts four and five.

■ Defendant's testimony permits the inference that Reed was present when he was advised by Reed's lawyer that the securities need not be registered. Since we have already determined that defendant's allegedly good faith in relying upon the advice of counsel is not a defense with respect to these two counts, the error in not permitting Reed to testify with regard to the advice given by the lawyer was harmless. There was no offer of proof to indicate in what other respect Reed's testimony might have been relevant and material.

Defendant further contends that the trial court erred in limiting the cross-examination of the government witness, Bernier. We have considered defendant's arguments and find that they are without merit.

■ Also without merit is defendant's contention that the trial court erred in refusing to allow him to prove the excellence of his machine. We adopt the following language from the government's brief: " * * * the indictment nowhere charges any misrepresentation which involves the merits of the alleged steam-generating machine of the defendant, and the government introduced no proof at the trial that the steam machine did not work." Since the excellence of the machine was not in issue, no purpose would have been served had the defendant attempted to demonstrate it.

The judgment entered by the District Court convicting defendant on counts one, two, seven, eight, nine, and ten is,

reversed. The judgment convicting defendant on counts four and five is reversed and remanded for a new trial. The judgment convicting defendant on counts three, six, eleven and twelve is affirmed.

HASTINGS, Chief Judge (concurring in part and dissenting in part).

I concur in that part of the majority opinion affirming defendant's conviction on counts eleven and twelve.

I concur in the result reached by the majority in affirming defendant's conviction on counts three and six.

I respectfully dissent from that part of the majority opinion resulting in the reversal of defendant's conviction on counts one, two, seven, eight, nine and ten.

The majority reversed defendant's conviction on counts one, two, seven, eight, nine and ten because no representations as to financial backing were made to the investors named in those counts. The crux of this holding is that the scheme extends only to those investors who felt the impact of the misrepresentations as to financial backing. The majority has split a single, integrated course of conduct into two separate courses of conduct by deciding that there were in reality two schemes—one legal, the other fraudulent. Such is not the law, and the majority cites no case in support of this particular holding.

In order for the scheme to come within the terms of the statute, it is not necessary that the victim be deceived, and the scheme to defraud may exist although no misrepresentation of fact is made. Henderson v. United States, 6 Cir., 202 F.2d 400, 404 (1953), cert. denied, 349 U.S. 920, 75 S.Ct. 660, 99 L.Ed. 1253; Bobbroff v. United States, 9 Cir., 202 F.2d 389, 391 (1953). Furthermore, unlike common law fraud it is not necessary under the statute that any victim actually be defrauded. United States v. Sylvanus, 7 Cir., 192 F.2d 96 (1951), cert. denied, 342 U.S. 943, 72 S.Ct. 555, 96 L.Ed. 701.

It is not necessary to show that the entire course of the transaction was a fraud. In Stephens v. United States, 9 Cir., 41 F.2d 440 (1930), cert. denied, Spicer v. United States, 282 U.S. 880, 51 S.Ct. 83, 75 L.Ed. 777, certain aspects of the defendants' business were perfectly legal, and the defendants claimed that the mailings charged were in furtherance of the lawful aspects of their business. The court stated:

"In respect of the question whether such use of the mails was in the 'execution' of the 'scheme' to defraud, defendants' position is, in the main, that the business conducted by them is not shown to have been wholly fraudulent, in all of its branches, and that the mailings were made in the promotion of the lawful features, or at least that the evidence fails to show any connection with those branches which were promoted by deception and false pretenses. But direct connection was not requisite. The business was a single general enterprise, and a lawful activity in the course thereof might very well have made a material contribution to the success of another activity illegitimate in its purpose or fraudulent in the means used in carrying it forward. * * * If fraudulent in important and continuing branches of its activities, the enterprise as a whole may properly be characterized as a fraudulent scheme." Id. at 447 of 41 F.2d.

It is the clear holding of Stephens that the fraudulent aspects of an enterprise taint the entire enterprise. The majority opinion appears to be directly to the contrary when it states that "even though a scheme to defraud in the sale of securities may have been devised and have been operative on certain investors, if a sale of these same securities would be legal absent the employment of the scheme and if the sales to those investors in which the use of the mails are charged is not tainted by the employment of the scheme, no offense has been proved."

The majority holding reversing the conviction on these counts, without precedent, in my opinion is an unwarranted doctrine based upon a theory that runs counter to the rationale of all holdings brought to our attention. I would affirm defendant's conviction on counts one, two, seven, eight, nine and ten.

I respectfully dissent from the majority holding that it was error to exclude the witnesses Krueger and Reed from the stand and in refusing to allow them to testify.

At the outset, it is important to examine the record relating to the exclusion order itself. At the opening of the trial and before any witnesses had testified, the court inquired: "Is there a motion to exclude?" Defendant's counsel, Mr. Grant, replied: "Yes, your Honor." Pursuant to the Government's request, Thomas Howard, a representative of the Securities and Exchange Commission, was permitted by the court to sit and participate with the Government. The court then announced in open court the following rule:

"Any and all witnesses in the case of the United States of America versus Carl D. Schaefer who are in the courtroom are asked to leave the courtroom and go to the witness room which is just back of the courtroom."

This was a trial to the court, without the intervention of a jury. The motion to exclude the witnesses was made by defendant, not the Government.

During the trial, defendant called Krueger as a witness on his behalf. When it was brought out by defendant's counsel that the witness had been present in the courtroom during the course of the trial when testimony was being given, the Government objected to his testifying. The witness was examined by counsel for both sides and by the court. Krueger admitted being present in court "twice" while witnesses were testifying. Government counsel stated that, "now that I know who he is," he had seen him in the courtroom "at least three times" and "in the corridor outside of the courtroom on numerous occasions during the trial." The record shows that the following then took place:

"The Court: The motion to exclude will be allowed.

"Mr. Grant [defendant's counsel]: Then I assume you mean, Judge, that the objection to this witness testifying is sustained?

"The Court: That is right. It will be sustained in that he has been present during the trial of the case.

"Mr. Grant: All right. Step down.

"The Court: Step down, sir. That is all."

Other than to make a statement during a colloquy while Krueger was on the stand that "I think the testimony he is going to give would not have been pertinent to the testimony given by any Government witness, and that perhaps the rule shouldn't apply," defendant's counsel made no offer of proof, no showing as to what the witness would testify if permitted to do so; indeed, no representation of any kind as to the nature and relevancy of anything the witness might say.

The majority holds that "the error in failing to permit Krueger to testify was prejudicial as to counts four and five." To support this finding of prejudice they say:

"The record shows with respect to counts four and five that Krueger *may have been present* during several conversations between defendant and Turney. It was during these conversations that defendant allegedly made false statements pertaining to the financial backing of his invention and statements regarding Turney's authority to solicit contracts. Defendant denied he had any knowledge or reason to believe that Turney was writing anyone concerning the machine, and stated he had never authorized Turney to make representations concerning the

machine. It thus appears from the record that Krueger's testimony was relevant and material because of the discrepancy in the testimony of defendant and Turney." (Emphasis added.)

It is conceded that there is no federal appellate court case holding prejudicial error resulting from the refusal to permit witnesses to testify who disobeyed an exclusion order. There are a number of holdings that it is within the trial court's discretion to allow a witness who has disobeyed the rule to testify. Likewise, it is well settled that it is within the discretion of the trial court whether to put such a rule into effect.

Certainly, all hands agree that either the allowance or refusal of testimony by witnesses found to be in violation of an exclusion rule lies within the sound discretion of the trial court. It is well settled that under such a discretionary rule a reviewing court will not disturb an exercise of discretion unless it finds the latitude given a trial judge to have been clearly abused with prejudicial results.

Defendant's witnesses were excluded on his own motion. One would have to be naive indeed to believe that neither defendant nor his counsel did not know that Krueger was sitting in the courtroom or loitering in corridors in violation of the exclusion rule. Since defendant invoked the rule he had a compelling duty to see that his witnesses obeyed and to advise the court promptly of such disobedience.

It is to be noted that neither defendant nor his trial counsel ever represented to the court that they had no knowledge of Krueger's presence in the courtroom in violation of the exclusion rule.

Assuming that defendant did not know Krueger had violated the rule when called to testify, when the Government properly questioned the propriety of his testifying, under the circumstances of this case, the defendant had a positive duty to inform the trial court concerning the nature and relevancy of the proffered testimony; if not by formal offer of proof, then at least in some informal manner. Instead, defendant merely stated that such testimony would not be pertinent to the testimony given by the Government's witnesses.

Now, on appeal, defendant would have us search the cold record and guess what Krueger might have testified to and then guess again as to its relevancy and then hazard a finding that this was all material to defendant's conviction. This is a tortuous route on which to find a gross abuse of discretion.

It is to be noted with commendation that the majority finds no prejudicial error in the exclusion of the witness Reed's testimony. We, therefore, have no need to consider further the rejection of his testimony. Further, with the foregoing single exception, there was no finding of prejudicial error as to Krueger's excluded testimony. These findings of lack of prejudicial error are based on the immateriality or irrelevancy of such proffered testimony or the failure to make an offer of proof. I think the court errs today in making this single exception. It is not enough to say that "Krueger may have been present during several conversations between defendant and Turney."

This was a bench trial before an able and experienced trial judge. He could best gauge the purport of his action. We may disagree with his ruling. We may have ruled to the contrary had we sat in his place. But we may not substitute our judgment for his. We may set aside his judgment on a clear showing of gross abuse of discretion resulting in prejudicial error. I do not find that present in the record in this case. I would affirm the judgment of conviction on counts four and five.

In conclusion, I would affirm the judgment of conviction on all counts.