[No. 40494.    Department Two.    December 24, 1969.]

THE STATE OF WASHINGTON, *Respondent*, v. ROGER LEE JOHNSON, *Appellant*.[*]

*Reported in 462 P.2d 933.

*E. Albert Morrison*, for appellant (appointed counsel for appeal).

*Ronald L. Hendry, Joseph D. Mladinov*, and *Eugene G. Olson*, for respondent.

HALE, J.—Whoever shot Colonel Morgan at close range with a shotgun intended to kill him. The blast tore away the lower part of his face and jaw, but he survived to tell about it in court. He described the route he had been traveling just before the attempted murder and mentioned a white car which seemed to have been used by the assailant. The state proved to the satisfaction of the jury that Morgan's son-in-law, Roger Lee Johnson, was the intended executioner. Johnson now appeals a judgment and sentence of not more than 20 years' imprisonment.

The Prosecuting Attorney for Pierce County charged Roger Lee Johnson with the crime of assault in the first degree, alleging that on the 26th day of May, 1968, the accused "with intent to kill William Morgan, did assault the said William Morgan with a firearm and deadly weapon likely to produce death, to-wit: a shotgun." The jury returned a verdict of guilty and a separate special verdict that the defendant was armed with a deadly weapon. Appealing the judgment and sentence of not more than 20 years' imprisonment, defendant specifies six assignments of error, including the testimony of an admitted accomplice, one Roy Hamilton Zaabel, and the insufficiency of the whole evidence to support a conviction.

In the third assignment of error, defendant says he did not get a fair trial and makes two contentions: (1) that the court prejudicially required the accused and his counsel to sit at the counsel table farthest from the jury box during selection of the jury, and (2) that the court excluded the

substantive testimony of defendant's wife after defendant had declined to include her among sequestered witnesses.

The question as to the seating arrangement arose when defense counsel said that the three attorneys for the state had preempted the counsel table closest to the jury box; that this gave the state a marked advantage and put the accused to a distinct disadvantage during voir dire examination of the jury; and that this proximity would magnify the effect of the prosecution's papers and documents when sorted and handled close to the jury during trial. He objected to the arrangement.

■ Most errors occurring during voir dire examination of a prospective jury are correctable by admonitions and instructions and are addressed largely to the trial court's sound discretion. 2 Orland, Wash. Prac. § 196 (2d ed. 1965). Physical arrangement of the courtroom, including placement of jurors, counsel and parties, and the location of bench, witness box, court reporter and clerk during all stages of trial likewise falls within the discretion of the trial judge. Since two persons cannot occupy the same exact spot in the courtroom at the same time, and the perfect courtroom apparently has not yet been designed— or, if designed, certainly not made available to the judges of this state—the power to control the location of parties, jurors, counsel, witnesses and attachés is both necessary and important. If, despite objection, it appears that the court has not abused its discretion in allocating seating arrangements and has not positioned either party or counsel to such a disadvantage as to reflect animus, bias or ill will, or unnecessarily deprived counsel or parties of a fair vantage point, or reflected unfairly upon or disparaged a party in the view of the jury, then the discretion has not been abused and the court's ruling will not be disturbed. It would have been awkward and impracticable to have all counsel sit at the table nearest the jury during voir dire. As to the remainder of the trial, the court indicated it would allow an exchange of positions, declaring:

at the time of the trial of the case that during presentation of the evidence by the prosecuting attorney as far as

> I was concerned he might sit in those seats nearest to the jury, and at the time when the burden of proceeding rested upon the defense counsel those positions may be reversed.

Because the trial court has a duty to conduct the trial fairly, expeditiously and impartially, it has a corresponding power to adopt practices and procedures reasonably designed to secure such ends. 88 C.J.S. *Trial* § 36 (1955). As to those matters not regulated or covered by statute, formal rule or precedent, the law, to enable the trial court to conduct the trial with dignity, decorum and dispatch and maintain impartiality, necessarily vests in the trial judge a wide discretion. This discretion naturally includes control of seating arrangements for parties, counsel and witnesses. Although the following authorities do not cover the precise point in issue here, they do sustain the idea of a broad discretion in the trial court to govern the seating arrangements in the courtroom: *Commonwealth v. Schwartz,* 210 Pa. Super. 360, 233 A.2d 904 (1967); *Shaver v. State,* 165 Tex. Crim. 276, 306 S.W.2d 128, *cert. denied,* 355 U.S. 864, 2 L. Ed. 2d 70, 78 S. Ct. 98 (1957); and *Williams v. State,* 155 Tex. Crim. 370, 235 S.W.2d 166 (1950). We find nothing in the record to support a conclusion that the trial court abused its discretion as to the seating arrangements during the trial.

Defendant assigns error to the ruling that the defendant's wife, having remained in the courtroom during trial when all other witnesses had been excluded, was ineligible to give substantive testimony of alibi. At the beginning of trial, the prosecuting attorney, stating that he had not yet received a list of the defendant's witnesses, moved for the exclusion of all witnesses. Defendant said that he had not yet determined whether he would call his wife to the stand, but insisted that he had a right to have her present during trial and to testify if he did decide to call her. He urged that the order of sequestration of witnesses should not apply to the wife of one on trial for a serious crime.

In the colloquy, defendant indicated his wife's testimony would corroborate his alibi. The court then announced that

it would apply the exclusionary rule to defendant's wife if her evidence would be other than evidence as to character and reputation, ruling:

> Well, I think the rule applies to all witnesses. If she is only going to testify to character or something like that, that's one thing, but if she'll testify as to any facts pertinent or relevant to defense of her husband by way of corroboration, it seems to me she comes within the rule.

and,

> She may remain, but if she's called as a witness I will prevent her from testifying under the prosecution's motion.

The court then ordered all witnesses excluded from the courtroom, and the defendant elected to have his wife remain. After the state had concluded its case in chief, the victim's wife testified on behalf of the defendant. Then the defendant took the stand, giving a detailed account of his activities before, during and right after the established time of the shooting. Denying both his guilt and any guilty knowledge of the crime, the defendant called his wife to the witness stand. Ruling that the defendant had made an election in having his wife remain in the courtroom, the court sustained the state's objection to her giving substantive testimony.

The defendant thereupon offered to prove that his wife, Joyce Johnson, would testify that she had remained at home on the evening of the 25th with her husband; that they had visitors in their home; that her husband was present in the home with her on the morning of the 26th of May, 1968; that he helped take care of their child that morning; and that they left their home to go skeet shooting at Gig Harbor—as her husband had earlier testified—and that she remained with him at Gig Harbor, watched him shoot skeet there and then returned home with him. In substance, she would testify that her husband never left her presence at the home or enroute to Gig Harbor during all periods relevant to the time of the crime as shown by the state's evidence. The court, adhering to its earlier ruling, excluded this offered evidence.

428

■ Neither the defense nor the prosecution has cited authority concerning the exclusion of the wife's alibi testimony. The power to exclude witnesses from the courtroom, we think, falls within the general discretionary powers of the court to be exercised during trial in aid of eliciting the truth, promoting the orderly presentation of evidence, and to assure that all parties, in the exercise of reasonable diligence, are afforded fair opportunity to offer all relevant evidence. *State v. Weaver*, 60 Wn.2d 87, 371 P.2d 1006 (1962); *State v. Lee Doon*, 7 Wash. 308, 34 P. 1103 (1893); *Holder v. United States*, 150 U.S. 91, 37 L. Ed. 1010, 14 S. Ct. 10 (1893); *United States v. Schaefer*, 299 F.2d 625, 14 A.L.R.3d 1 (7th Cir. 1962), *cert. denied*, 370 U.S. 917, 8 L. Ed. 2d 497, 82 S. Ct. 1553; and *Taylor v. United States*, 388 F.2d 786 (9th Cir. 1967).

If, through inadvertence, inattention or mistake an excluded witness remains in the courtroom under circumstances which show the witness and the party who calls him are innocent of intention to violate the court's order, it is generally held an abuse of discretion to deprive a party without fault of substantive evidence. Accordingly, in those cases where the court receives the testimony of a witness who failed to comply with an order of sequestration, the court's ruling will not be disturbed on review unless special circumstances are shown that the witness remained in the courtroom with the consent, or connivance, or knowledge of the party calling him. *Holder v. United States, supra*. Thus, the ruling of the trial court in such matters as the separation of or admonition to witnesses will not be disturbed except upon a showing of manifest abuse of discretion. *State v. Weaver, supra; State v. Fairfax*, 42 Wn.2d 777, 258 P.2d 1212 (1953); *State v. Brown*, 31 Wn.2d 475, 197 P.2d 590, 202 P.2d 461 (1948); *Castleman v. Schiffner*, 160 Wash. 313, 294 P. 983 (1931). Ordinarily, it would be error to deprive a party and the court of the testimony of a witness who, unaware of the admonition to stay outside the courtroom, mistakenly remains and hears others give evidence. *State v. Lee Doon, supra; Castleman v. Schiffner, supra*. It is recognized that, although the sequestration of

witnesses may be an aid in eliciting the truth, a party who is innocent of or not privy to a violation of the order of sequestration should not be deprived of the witness' testimony. *United States v. Schaefer, supra.* The court may, of course, vindicate its authority over recalcitrant witnesses who have violated the sequestration order by employing its contempt powers. *Taylor v. United States, supra.*

None of the cases referred to precisely covers the narrow point at issue, for here we are not dealing with a witness who violated the exclusion order but with a defendant who was allowed a choice and chose to ignore it. There was nothing ambiguous about the court's order of excluding the defendant's wife nor the accused's options under it. The defendant not only understood the court's order of exclusion, but, fully apprised of the consequence, insisted that his wife remain with him and argued her competency to testify in extenso. In the face of the court's ruling that the wife of the accused would not be allowed to give substantive alibi evidence if she stayed in the courtroom, the defendant made a deliberate election to have her remain. Thus, there existed the special circumstances of an election giving rise to a broad discretion in the court to admit or exclude her testimony—a discretion to be disturbed on review only on a clear showing of abuse. *Lang v. State,* 137 Fla. 128, 187 So. 786 (1939). When, in the face of the court's order of sequestration, the defendant decided to have his wife with him in the courtroom, he made a binding election and, in our opinion, the court did not abuse its discretion in holding him to it. *Lang v. State, supra.*

Defendant directs his main claims of error to the testimony of one Roy Hamilton Zaabel, an admitted accomplice. It is contended that Zaabel's testimony should have been excluded because it was induced by misleading promises of immunity from prosecution; that these promises were false and amounted to bribes; and that Zaabel's testimony constituted the state's whole proof and was uncorroborated and insufficient to support a conviction.

The prosecution regarded Zaabel as an accomplice but considered him to be an indispensable witness to the state's

case. June 12, 1968, the prosecuting attorney charged Roy
Hamilton Zaabel in district justice court with the crime of
first-degree assault against Colonel Morgan by means of a
shotgun—the identical offense charged against defendant
on trial. Pending against Zaabel in justice court at the time
was another criminal complaint filed June 10, 1968, charg-
ing first-degree forgery. Zaabel had been apprehended in
Wichita Falls, Texas, and returned to this state either to
stand trial on these felonies or to give evidence as a mate-
rial witness. Thus, when the present trial began, Zaabel
was in custody on two felony warrants issued on com-
plaints pending in district justice court.

The trial was under way when the prosecuting attorney
took Zaabel before the justice courts and moved to dismiss
each complaint. In support of each motion, the prosecuting
attorney filed an affidavit stating that Roy Hamilton Zaabel
was a material witness; that his testimony was necessary to
a conviction of Johnson; and that Zaabel had been prom-
ised immunity by the state. The motion for dismissal was
granted in the district justice court in both the first-degree
assault case and the first-degree forgery case.

Anticipating that Zaabel would be called as a state wit-
ness, the defendant made timely application to exclude his
testimony. He urged that Zaabel's testimony had been de-
ceitfully and illegally induced by means of unenforceable
promises of immunity. In arguing the exclusion, he said
that Zaabel, under a promise of immunity, would testify
that the defendant planned and executed the crime and had
promised to pay Zaabel for his participation, and that Zaa-
bel then knowingly drove the car from which Johnson fired
the shotgun blast at Colonel Morgan. Defendant contended
that, since attempted murder is not one of the crimes for
which immunity may be bindingly promised, the dismissals
were obtained through fraud and deceit.

Several witnesses, including Colonel Morgan, had testi-
fied before the state called Roy Hamilton Zaabel to the
witness stand. At that point and in the jury's absence, the
learned trial judge told Zaabel:

[Y]ou have the constitutional right to refuse to answer

any questions put to you which would in any way incriminate you  .  .  .  be the source of evidence which could result in your being charged with a crime  .  .  . [I]f you elect to avail yourself of it [the constitutional right], must be urged by you at the time the particular question is asked  .  .  .  [T]hat is a right peculiar to you as a witness in this case due to the circumstances of your alleged connection with it. This right may be waived by you if you see fit to do so. By that I mean you may answer such questions as propounded to you without urging your right not to answer on the grounds of incrimination. Whether the question will elicit an answer which might tend to incriminate you is a matter for me to determine and if you do claim that right under the constitution the Court will determine at that time whether the answer to the question might tend to incriminate you. If it does, you will not be required to answer it.

Then, concerning the promises of immunity, the court, speaking directly to the witness, said:

Now it has been brought to the Court's attention prior to your being called as a witness that certain promises or arrangements were made by the prosecuting attorney's office which have culminated according to the Court's information in the dismissal of a previous charge against you arising out of an incident which we are concerned of in this case charging you with first degree assault and also a charge alleging that you were guilty of first degree forgery, the files have been introduced here indicating the prosecuting attorney has dismissed in justice court both of those charges. It has been indicated here or suggested that the prosecuting attorney has promised you what is known in law as immunity from prosecution further in those two matters. In order that you understand your rights completely, I want to advise you now that the prosecuting attorney has dismissed these two charges, but that *under the law neither the prosecutor nor this Court could guarantee to you that within the statute of limitations that if the present prosecutor's office was not present that any successor could not again charge you with these crimes, do you understand that?* A. (Indicating yes) Q. They have dismissed the cases, but I want you to understand clearly in deciding whether you wish to waive your privilege against self incrimination that *under the law they cannot grant you immunity,*

*neither can the Court* in this instance at least. With that understanding you may proceed. Do you understand what I have explained to you? A. Yes, sir. Q. *You understand your rights fully?* A. Yes.

(Italics ours.)

The court's advice to the witness is set forth here not to suggest that the defendant had any right to assert on his own behalf any rights, privileges or immunities belonging to Zaabel, the witness, but rather to make clear the circumstances leading to Zaabel's testimony and to better ascertain whether the state had, as defendant contends, coerced or deceived the witness into testifying against the defendant.

The record establishes three things about Zaabel's evidence: (1) Without Zaabel's testimony, the defendant could not have been brought to trial. His testimony was indispensable to a conviction; (2) The promises of immunity and dismissal of the first-degree assault and first-degree forgery charges were not binding upon the state; and (3) The witness was fully informed of and understood that the promises of immunity were not binding upon the state but nevertheless elected to testify.

That the prosecuting attorney could not bind the state to his promise of immunity under RCW 10.52.090 is clear, for that statute although providing that a "witness shall not be excused from giving testimony tending to criminate himself" and may not be prosecuted "for or on account of any action, matter or thing concerning which he shall so testify," is by its terms applicable only to certain specified crimes and not assault in the first degree or first-degree forgery, the crimes set forth in the dismissed justice court complaints. Under this statute (Laws of 1909, ch. 249, p. 890), the state may make a binding promise of immunity in cases of abortion (RCW 9.02.040), anarchy (RCW 9.05.050), bribery (RCW 9.18.080), duelling (RCW 9.30.050), and gambling (RCW 9.47.130), but this power does not appear to extend to cases of forgery, attempted murder and felonious assaults. Since, by his own admissions, the witness was particeps criminis in the crime

charged and was constitutionally immune from compulsory self-incrimination, the prosecuting attorney had no way of compelling him to give evidence.

Short of dismissing the information against Johnson for insufficient evidence, the state took the only choice available. It had to attempt to persuade the witness that, if he gave evidence against the accused, the prosecuting attorney's office, insofar as it had the power to do so, would refrain from prosecuting him on either of the felonies whereof he stood charged. Without Zaabel's testimony, it had no case; with it, the state had convincing proof of guilt.

■ The record shows that the witness knowingly waived his immunity against compulsory self-incrimination. Before he took the stand, the court clearly advised him that neither the prosecuting attorney nor the court had the legal power to grant him immunity from prosecution, and that the state was not barred from prosecuting him for any offense shown or made provable by his own testimony. The witness, being fully informed of his rights against compulsory self-incrimination and forewarned that the state's promises of immunity were unenforceable, was not, therefore, under threat, coercion or deceit. Zaabel, too, in electing to testify, made a choice—to become a competent witness on behalf of the state. Any disability arising from the dismissal of the charges and the prosecutor's promises went to his credibility as a witness—to the weight and not to the admissibility of the testimony.

As to the sufficiency of the evidence, we will summarize Zaabel's testimony. On direct examination, he said that he had been convicted of two felonies, forgery and transporting mortgaged property. He had met the defendant about 3 months before the shooting. He said that on Saturday, May 25th, he had a conversation with Johnson at his house about shooting the latter's father-in-law. The conversation occurred about noon, and Johnson told him that the next morning Colonel Morgan was going fishing and that would be the time to kill him. According to Zaabel, they were to use Zaabel's 1958 white Thunderbird car. He said the de-

fendant did not, in that Saturday's conversation, indicate just how he was going to kill the Colonel except that they would use Zaabel's car in the enterprise.

After this conversation on Saturday, Zaabel talked to Johnson again, this time on the telephone about 10:30 or 11 that night. Johnson, he said, instructed him when and where to pick him up. He said he saw Johnson the next morning at 5:30, Sunday, May 26, 1968, when, at the time appointed in the telephone conversation, Zaabel drove his automobile to the defendant's house, picked him up there, and the two drove the car "out by the Colonel's house."

Zaabel testified he did the driving and that they stopped probably a quarter of a mile from the Colonel's house. They could not see the house from their car but could see the driveway leading to it. He saw the Colonel's car pull out of the driveway onto the road and go east. Zaabel and Johnson in the white Thunderbird followed it. Zaabel was still at the wheel and Johnson sat in the back seat, said Zaabel, holding a shotgun. The Colonel's car, according to Zaabel, "went to the corner and made a right turn, went about a mile and turned left again," and Zaabel continued to follow it.

Then, driving the white Thunderbird at a high speed—approximately 80 miles per hour—Zaabel overtook and passed Colonel Morgan's car and drew up at a stop sign at a crossroad. When he passed the Colonel's car doing 80 miles an hour, Zaabel said they were about ¼ mile from the stop sign. There the two men waited at the stop sign for the Colonel's car to reach the intersection. The Colonel's car pulled to a stop to the right of and alongside Zaabel's car and, as Zaabel testified:

Q. Where was Roger then at that point? A. In the back seat of the car. Q. What occurred at that point? A. Well, I looked down the road to see if there was any cars coming and I was going to go ahead and pull out and at that time that's when I heard the shot. Q. A shot was fired? A. Yes. Q. From your car? A. Yes. Q. Who fired that shot? A. Roger Johnson. Q. What did you do then? A. I pulled out on the main road and went back to Tacoma.

Still on direct examination, Zaabel repeated much of this. He again said that Johnson had not discussed the procedure he would follow in killing the Colonel but had made it clear that he was going to shoot him. He reiterated that while they were parked on the road waiting for the Colonel's car to emerge from his driveway, Roger Johnson had moved from the front to the back seat. The rear seat, he said, had manual roll-down windows and the right rear one was rolled down. Roger fired the shot from the rear seat through the opened right rear window of the white Thunderbird.

Immediately after the shot was fired, Zaabel said, he drove the two of them to Roger Johnson's house where Johnson got out of the car. Zaabel left for a while and returned to the house at about 9:30 that morning. Then they drove to the Sportsmen's Club in Gig Harbor. He said that, at the club, he, Zaabel, "laid down in the back seat of the car and went to sleep," while Roger "Shot, I guess." Roger had a shotgun in his possession while the two were enroute to the skeet range at the Sportsmen's Club. Zaabel said the shotgun was possibly the one Johnson fired that morning at Colonel Morgan.

Zaabel went on to say that he brought Johnson back to the latter's house from Gig Harbor and did not see him again until 2 a.m. the next day—that is, Monday morning —when he asked for money, testifying on that point:

A. I asked about the money that was supposed to come off of this thing and he said he couldn't get it to me. Q. Did Roger discuss with you payment for your services? A. Yes. Q. What were you to receive? A. Well, it started out at $1,000 and then it was supposed to be 5,000 or more. Q. You were to receive that from Roger? A. Yes. Q. What did he say after the shooting then with reference to the money? A. He said he couldn't get it. Q. What did you do then? A. I left here and went to Wichita Falls, Texas. Q. You left Tacoma? A. Yes. Q. You were apprehended then in Wichita Falls, Texas? A. Yes.

On direct examination, Zaabel testified that the prosecuting attorney had agreed to and in fact had dismissed two justice court felony complaints against him, one charging

first-degree assault and the other forgery in return for which Zaabel was to testify in the case on trial.

On cross-examination, Zaabel said that he had four prior felony convictions, that he had served 9 years in prison and was on parole when he arranged with and drove Roger Johnson to the place of planned murder of Colonel Morgan. He said that he knew he was liable for an habitual criminal sentence if convicted of forgery. After his flight to Texas, a deputy sheriff first talked to him and told him the state of Washington could drop all charges against him if he returned to Washington and testified against Johnson. He decided to return and give evidence. He said he felt he had either to testify to convict Johnson or face life imprisonment himself, but denied that the prosecutor had told him what to say in his testimony. He said that the prosecutor did not tell him that he wanted to convict Johnson nor did anyone else make such a statement to him. Zaabel said he gave his testimony in reliance upon the prosecuting attorney's promise not to prosecute him for his participation in the attempted murder of Colonel Morgan and the dismissal of the forgery charge. He repeated on cross-examination that the gun shown him in court "looked like the gun" which Roger Johnson shot from the back seat of Zaabel's car.

On redirect examination, he repeated that no one had ever told him what his testimony should be, and that his account of the crime was truthful and of his own knowledge.

Defendant assigns error to the admission of Zaabel's testimony, contending that the promises of immunity disqualified him as a witness and rendered his testimony incompetent. He argues that, since the prosecuting attorney did not have the power to grant immunity in a case of attempted murder, his acts in doing so were without authority in law and amounted to coercion and bribery and a denial of due process of law.

The question of the validity of a promise of immunity raised by this assignment of error is not squarely before the court, for it is the defendant and not the witness who is

claiming the invalidity of that promise. The question of whether there exists an equitable right to an enforcement of this promise of immunity is not present and would arise only if at some future time the state should attempt to prosecute the witness on either of the two dismissed charges.

One of the sordid facts of life is that the most cogent proof of guilt frequently derives from an evil source. Criminals seem to know more about crimes than good people, and the state must get its evidence where it finds it.

A promise of immunity by the state, therefore, for the purpose of securing the testimony of one who has testimonial knowledge of the crime charged but cannot be compelled against his will to testify is not unknown to the criminal law and does not ipso facto render the testimony incompetent and inadmissible. If the promise is unenforceable but the promisee nevertheless believes or says he believes it was made in good faith—even though both may be without legal power to bind the state to it—making of the promise alone does not render the witness incompetent or preclude his testimony. The promise of immunity goes to the weight of the testimony and may be considered by the jury in determining what effect to give to the testimony of an admitted accomplice. It is the jury and not the court which weighs the evidence and determines to what extent the promise of immunity amounts to a reward or threats and coercion in inducing the promisee witness to waive his constitutional rights against self-incrimination.

As long as the jury is fully advised of the inducements and the tests to which an accomplice's testimony should be subjected, the actions of the state in attempting to secure the testimony of an accomplice are neither immoral nor unconscionable nor a denial of due process of law. Statutes and appellant decisions which provide for immunity in particular cases and special circumstances and sustain convictions based on the uncorroborated testimony of an accomplice have long since met both the legal and the moral test. For example, the court of its own motion or on motion of the prosecuting attorney may, in the furtherance of justice,

order a prosecution dismissed if good and sufficient reasons for the dismissal are specifically set forth of record. RCW 10.46.090. Dismissal on such motions in cases of misdemeanors and gross misdemeanors shall be a bar to further prosecution for the same offense. RCW 10.43.010.

The prosecuting attorney should support his motion for dismissal by setting forth his specific reasons in an affidavit. *State v. Camp*, 67 Wn.2d 363, 407 P.2d 824 (1965). Such an affidavit was filed here showing that Zaabel was an indispensable witness and that without his testimony the defendant would be exonerated. The affidavit did mistakenly recite that the promise of immunity had been made in accordance with the authority granted the prosecution under RCW 10.46.110. Because it concerns the dismissal of one defendant that he may testify for the state against a codefendant, that statute (RCW 10.46.110) would be inapplicable here but we do not see how the defendant may avail himself of this mistake for he was not the promisee. Nor would a promise of immunity to Zaabel fall under the authority of RCW 10.52.090, which does not apply to assault in the first degree, but rather as earlier noted to the specifically described crimes of abortion, anarchy, bribery, duelling and gambling. Whatever error may be claimed from this mistaken recital affected the witness and not the accused. If it amounted to error it was, we think, fully cured before the witness testified when the court in great detail advised the witness that neither the court nor the state could make a binding promise of immunity; that any immunity contemplated by either the witness or prosecutor could be repudiated by the prosecutor's successor; and that the witness in testifying was waiving any rights against self-incrimination.

When the witness, thus fully advised of the hazards to which his testimony might expose him, nevertheless elected to testify and gave evidence which not only incriminated the accused but himself as well, his actions were in law voluntary, freely undertaken and without legal duress or compulsion. He elected to testify under circumstances which provided him with the strongest protection known to

the law—the protection afforded him by a trial judge presiding in open session of a court of unlimited jurisdiction. No moral stigma attaches to an unenforceable promise of immunity made in good faith by the state when given with an honest purpose to prove the guilt of an accused and when motivated only by a purpose of obtaining evidence which would be otherwise unobtainable. The legislature has given legal sanction to this procedure in similar but not precisely the same situations by providing that when two or more persons are included in one prosecution the court at any time before the defendant has gone into his defense may "direct any defendant to be discharged, that he may be a witness for the state." RCW 10.46.110. Promising an accomplice immunity if he turns state's evidence is a time-honored practice and one sustained by the weight of authority. 1 R. Anderson, Wharton's Criminal Law and Procedure § 165 (1957); *United States v. Ford,* 99 U.S. 594, 25 L. Ed. 399 (1879); *United States v. Levy,* 153 F.2d 995 (3d Cir. 1946); 22 C.J.S. *Criminal Law* § 46 (1961); 21 Am. Jur. 2d *Criminal Law* § 147 (1965). Whether the promise of immunity, time-honored though it may be, shall be a bar to prosecution or simply a basis for probation or executive clemency is not before us, and we do not decide that question. It is the defendant's case we are considering, not that of the witness.

█ In this jurisdiction, as in nearly all others, an accomplice may testify on behalf of the prosecution. A conviction may rest solely upon the uncorroborated testimony of an accomplice if the jury is satisfied beyond a reasonable doubt of the accused's guilt and has been sufficiently cautioned by the court to subject the accomplice's testimony to careful examination and to regard it with great care and caution. *State v. Badda,* 63 Wn.2d 176, 385 P.2d 859 (1963); *State v. Eichman,* 69 Wn.2d 327, 418 P.2d 418 (1966). On this point, the record shows that instruction No. 15 fully cautioned the jury as to the weight to be given and the light in which an accomplice's testimony should be regarded.

But even though the jury could, under this instruction,

well have found the defendant guilty on the uncorroborated testimony of Zaabel, the record shows, we think, that his testimony was in many important respects actually corroborated by other evidence, on some points by the testimony of the defendant himself.

Colonel Morgan testified that he left his house and drove out of his driveway within 2 or 3 minutes of 6 a.m., turned left onto the road and went one block to Vickery and thence onto and proceeded on 128th Street to the stop sign at Canyon Road intersection. This testimony corroborates the route which Zaabel said he followed. The Colonel said that before reaching the stop sign he saw a car in the rearview mirror approaching at a "very, very high speed," that it passed him on his left before he stopped at Canyon Road, and that it stopped so as to force him to pull up alongside it on its right to make a right turn. This also corroborates the events of the attempted murder as described by Zaabel. The Colonel said the car was so dirty he couldn't be sure of its color but he would say, despite the dirt on it, that it was white in color. This corroborates Zaabel's testimony that the car he drove to the scene of the crime was a white Thunderbird.

Zaabel's testimony thus concerning the route traveled, the time and place of the shooting, and the details of flight after the shooting and subsequent but relevant events was, we think, corroborated not only by the victim but partly by the testimony of the accused. Although defendant denied participation in any way in the shooting and of having knowledge that it would occur and testified that he was at home during the time when the state's evidence showed it happened, the accused's testimony did corroboratively link him to Zaabel.

The defendant testified that, when he arose and went downstairs the morning of the shooting, Roy Hamilton Zaabel was asleep on the couch or possibly on an overstuffed chair. He said that his doors were always open and people were welcome to come in and stay the night when in the vicinity. He said he wakened Zaabel, gave him coffee and

invited him to go to Gig Harbor to attend a shoot. Thus, he corroborated Zaabel's testimony that they knew each other; that they were together that morning; and that they did attend a shotgun shoot during a relevant period after the shooting—depending on which versions of the evidence the jury found believable. Zaabel's testimony was, therefore, not wholly uncorroborated but, on the contrary, was supported by substantial evidence on several crucial points.

The judgment is, therefore, affirmed.

HUNTER, C. J., HILL and ROSELLINI, JJ., and DONWORTH, J. Pro Tem., concur.

