FILED

12/10/2020

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
July 15, 2020 Session

## STATE OF TENNESSEE v. LAWRENCE EUGENE ALLEN

**Appeal from the Circuit Court for Rutherford County**
**No. F-76153   David M. Bragg, Judge**

_____

### No. M2019-00667-CCA-R3-CD
_____

The primary issue in this case involves the State's delayed disclosure of obviously exculpatory evidence.  On June 18, 2015, Lawrence Eugene Allen, Defendant, was arrested for aggravated rape and domestic assault of his wife, Kimberly Allen.  The charges were based primarily on Ms. Allen's statement to Detective Dustin Fait that Defendant struck her and penetrated her with his hand.  On June 22, 2015, the day before the original setting of the preliminary hearing, Ms. Allen sent two emails to Detective Fait.  In the first email, Ms. Allen stated that Defendant did not rape her.  She claimed that she had a consensual sexual encounter with an unknown man in his vehicle outside a bar in Nashville during the early morning hours of June 18, 2015.  After numerous continuances, a preliminary hearing was finally held on March 18, 2016.  The State did not disclose the emails to Defendant before the preliminary hearing.  Both Ms. Allen and Detective Fait testified at the preliminary hearing and were cross-examined by defense counsel.  Neither witness mentioned Ms. Allen's emails or her recantation of the rape allegation.  A few days after the preliminary hearing, Ms. Allen was murdered.  The murder was unrelated to this case or to Defendant.  The emails were finally disclosed to Defendant when the State provided discovery on December 21, 2017.  Prior to trial, Defendant moved to exclude Ms. Allen's preliminary hearing testimony based on Tennessee Rule of Evidence 804 and the Confrontation Clause of the United States Constitution and the Tennessee Constitution.  Following a hearing, the trial court declared Ms. Allen unavailable and denied Defendant's motion, finding that Defendant had both an opportunity and a similar motive to develop Ms. Allen's testimony at the preliminary hearing through cross-examination.  At trial, the State played the audio recording of Ms. Allen's preliminary hearing testimony for the jury and introduced the emails as substantive evidence.  The jury convicted Defendant of one count of aggravated rape and one count of domestic assault, and the trial court imposed an effective sentence of twenty years to be served at one hundred percent.  We hold that the State's failure to disclose the obviously exculpatory first email before Ms. Allen testified at the preliminary hearing, coupled with her death before trial, deprived Defendant of the opportunity to cross-examine Ms. Allen about the veracity of the emails, violated *Brady*

*v. Maryland*, 373 U.S. 83 (1963), and deprived Defendant of his constitutional right to due process of law.  We reverse Defendant's convictions and remand for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Reversed and Remanded for a New Trial**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL and TIMOTHY L. EASTER, JJ., joined.

Charles G. Ward and Brandon M. Booten, Murfreesboro, Tennessee (on appeal), and Charles G. Ward and Brittani Flatt, Murfreesboro, Tennessee (at trial), for the appellant, Lawrence Eugene Allen.

Herbert H. Slatery III, Attorney General and Reporter; Katherine C. Redding, Assistant Attorney General; Jennings H. Jones, District Attorney General; and Matthew W. Westmoreland and Sarah Davis, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### I. Procedural History and Trial

#### A. Pretrial Motions

The parties filed several pretrial motions, including the State's Motion to Declare Ms. Allen Unavailable and Motion to Use Preliminary Hearing Testimony and Defendant's Motion to Exclude Preliminary Hearing Testimony pursuant to Tennessee Rule of Evidence 804 and the Confrontation Clause of the United States and Tennessee Constitutions ("the Motion to Exclude").  The Motion to Exclude claimed that Defendant had no adequate opportunity or similar motive for cross-examination of Ms. Allen at the preliminary hearing because Defendant did not know that Ms. Allen had sent an email to Detective Fait stating that Defendant did not rape her and  that another man "used his hand to vaginally and anally penetrate" her earlier in his car outside of TNTs bar.  The Motion to Exclude stated that

> had defense counsel been aware of these details at the preliminary hearing,
> Ms. Allen's credibility and intentions for fabricating these allegations
> would have been the focus of the cross[-]examination, and a thorough

investigation under cross-examination regarding this unknown individual who sexually penetrated her would have provided exculpatory information for Defendant.

## B. Hearing on the Motion to Exclude

On January 3, 2018, the trial court heard several pretrial motions, including the State's Motion to Use Preliminary Hearing Testimony and the Motion to Exclude. The State argued that it needed Ms. Allen's preliminary hearing testimony at trial because Ms. Allen was "murdered subsequent to testifying at the preliminary hearing." Both parties agreed that Ms. Allen was unavailable pursuant to Tennessee Rule of Evidence 804(a)(4).

Defendant argued that he was "completely unaware" that Ms. Allen sent emails to Detective Fait four days after the incident in which she recanted the allegation of rape against him and claimed that another man sexually penetrated her. Defense counsel argued that if the State had disclosed the emails:

> the cross[-]examination in this matter would no longer be dealing with the facts of this case and the facts that arose that night and the allegations, but more so dealing with the basis as to why she made these allegations up. Why she sent this email. Why she has completely recanted. And why now she's alleging that there was some other man who caused these alleged injuries or vaginal bleeding to her.

The State responded that Defendant had "an opportunity and a similar motive to develop the testimony at the preliminary hearing" and that case law did not require an "identity of issues at the preliminary hearing and at the trial" but only that the issues be "sufficiently similar." The State then argued that "the inability for [Defendant] to ask questions regarding exculpatory issues does not get triggered at a preliminary hearing stage, because discovery does not apply" and that, "[a]s long as the State has provided the exculpatory information so it can be used in defense at trial, everything is okay."

Although the Motion to Exclude sought relief pursuant to Tennessee Rule of Evidence 804 and the Confrontation Clause, as the following dialogue demonstrates, the trial court raised questions about a potential *Brady* violation and correctly noted that "obviously exculpatory" information triggered the State's duty to disclose the information without a request from Defendant:

> THE COURT: Well, . . . of concern to the [c]ourt is whether or not this was obviously exculpatory and should have been provided.

[THE STATE]: It was provided though, Your Honor, in plenty of time for them –

THE COURT: At what time?

[THE STATE]: When discovery was filed by the State.

THE COURT: I understand. But it has to be provided when a request for discovery has been made, unless it is so obviously exculpatory. *And this is, to my mind, obviously exculpatory, and should have been provided when the State became aware of it.* And when the State became aware of it, in this [c]ourt's mind, is when the detective received the email and had it in his possession for several months prior to the preliminary hearing.

Now, granted, it's a unique situation that as far as I'm aware, because I haven't found any cases on point. But it seems the question is whether or not Defendant is going to be able to get a fair trial based on the status of the proof at this point.

. . . .

THE COURT: [Defense counsel], when does *Brady* apply?

[DEFENSE COUNSEL]: Judge, it would be my argument that *Brady* would apply from the very beginning. Obviously, if the State knows that a witness is not going to testify truthfully, then it's their duty to bring that to the attention of the [c]ourt.

THE COURT: Thank you. [The State], when does *Brady* apply?

[THE STATE]: After the Defendant is indicted and discovery is requested. And that is stated clearly in the case law I just handed the [c]ourt.[1] And I would just submit for the record, the State was not aware of the email. And as soon as we were made aware of it, we turned it over to the [d]efense. They have had it for quite some time.

---

[1] The State presented a copy of *State v. Christopher Terrell Shipp*, No. M2016-01397-CCA-R3-CD, 2017 WL 4457595, at *1 (Tenn. Crim. App. Oct. 5, 2017), to the trial court.

THE COURT: When you say the State wasn't aware of it, who had it to make you aware of it?

[THE STATE]: Presumably[,] Detective Fait.

THE COURT: So, the State officer who was investigating this on behalf of the State, is that correct?

[THE STATE]: Yes, Your Honor.

THE COURT: Okay. And in that case that you have provided, did the defendant or whoever it was, were they deceased and unavailable?

[THE STATE]: There is an issue -- it is not entirely factually on point with this case. In the case I provided, the defense had filed a motion to dismiss the indictment because they did not get a fair preliminary hearing because there was exculpatory information that was not provided to them at the preliminary hearing.

## C. Trial Court's Pretrial Order

Following the motion hearing, the trial court took the matter under advisement and then issued an extensive, thorough order addressing each motion argued by the parties. Concerning the Motion to Exclude, the order provided:

> Based on the motions, the arguments of counsel, and a review of the relevant law, this [c]ourt finds [D]efendant had a sufficiently similar motive to develop the alleged victim's testimony at the preliminary hearing. The issues at trial are the same as those addressed at the preliminary hearing, whether [D]efendant committed the offenses he is charged with in the indictment. The parties agree the alleged victim is unavailable as a witness due to her death, and finding [D]efendant had both an opportunity and a similar motive to develop the testimony through cross-examination of the alleged victim at the preliminary hearing, the alleged victim's preliminary hearing testimony is therefore ADMISSIBLE.

The trial court limited its ruling on the admissibility of Ms. Allen's preliminary hearing testimony to the Confrontation Clause claim raised in the Motion to Exclude.

## D. Trial

William Moyers, an Emergency Medical Technician with Rutherford County Emergency Medical Services, responded to a 9-1-1 call of vaginal injury and bleeding. Officers with the Smyrna Police Department (SPD) had secured the scene by the time Mr. Moyers arrived at the Allens' home. Mr. Moyers found Ms. Allen in bed "visibly shaking and crying." He observed what appeared to be blood on her arm, scratches on her face, bruises everywhere, and swelling over her left eye. She said that she had been assaulted by Defendant. Although she admitted to alcohol use, she did not seem intoxicated to Mr. Moyers. After getting dressed, she was moved by stretcher to a waiting ambulance and transported to Tristar StoneCrest Medical Center in Smyrna (StoneCrest). Mr. Moyers said that Ms. Allen appeared to be "really distraught" and "hurting all over."

Dr. William Bell saw Ms. Allen in the Emergency Room after triage. He said that she was "crying and extremely distraught" but not "intoxicated or confused." She said that Defendant punched her in the face many times because he thought "she might be having some type of affair" and that "he continued to beat her when she got home." Concerning the physical examination of Ms. Allen, Dr. Bell stated:

> The bruises were quite visible, as she had a lot of bruises on her face, petechiae, and what we call ecchymosis, which is kind of really dark bruising on her neck and shoulders and so forth. And she had bruises on her legs. She didn't have any chest trauma or abdominal trauma from that initial exam. Bruising to her neck. Petechiae are just like little busted blood vessels. You see it in a lot of people who have strangulation and because of the pressure that creates that.

Dr. Bell stated that Ms. Allen said that Defendant "put his fist into her vagina" and that she complained that she was having some vaginal bleeding and vaginal pain. Dr. Bell used a speculum to perform a pelvic exam. He testified that he did not "really see any bruising," "signs of any tears in the vaginal vault," or "trauma to the cervix." He said that "there was some blood in the vaginal vault" but no active bleeding at the time. When asked "if the pain that [Ms. Allen] was experiencing and blood in the vaginal vault [was] consistent with her report of having a fist put up inside of her vagina," Dr. Bell answered that was "a possibility." He stated that he found "no signs of trauma or bleeding or bruising at all" from a rectal exam. No rape examination was done because, based on the history provided by Ms. Allen, there would not be "any sperm to collect or any hairs or anything like that to collect." Dr. Bell explained that X-rays did not reveal any fractures or dislocations and that a CT scan of Ms. Allen's face and head "showed no evidence of fractures or any bleeds."

On cross-examination, Dr. Bell was asked "if a grown man rams a fist in the vagina of a woman with no lubrication, . . . how is it that that is possible there would not be any physical evidence of tearing, bruising, swelling?" Dr. Bell answered that he would expect to see some type of trauma. He then stated that he did not see "any trauma, just soreness." Dr. Bell testified that the medical record prepared by Nurse Carol McCullough "state[d] in quotation marks, rammed hand into vagina" and that, based on that description, he would expect to see "some bruising, swelling, tearing, some type of trauma to the vaginal area and definitely in the area of the labia, the vagina." He said, however, that he did not see any internal injuries during the speculum examination.

On redirect, Dr. Bell agreed that, because trauma does not have to be visible, he made it clear in his notes "that the speculum insertion caused [Ms. Allen] significant discomfort. So, something was going on there." He also agreed that blood in the vaginal vault "could be consistent with having a hand or a fist penetrating the vagina."

Dr. Bell read a portion of the medical notes prepared by Nurse Tammy Trover, who was working with him at the time:

> Patient states that her husband assaulted her because he accused her of cheating on him. The patient states that every time her husband drinks, he gets angry. Tonight[,] they were at a bar drinking a lot. And she states that her husband got mad and they left.
>
> The assault started in the car when she was driving, and her husband sat in the back seat. The patient states that the husband kept hitting her on the back of the head. She states that she was . . . able to talk him into getting into the front seat. When she pulled the car over, she states that when her husband got out of the car, she drove off and left him.
>
> When she arrived home, her husband was already in the house. She states that he started yelling at her and stated that she had been cheating . . . on him at which [time] he started to hit her. She also stated that he sexually assaulted her vagina and rectum with his hand.

SPD Corporal Joshua Johnson testified that, by the time he arrived at the Allens' home around 5:30 a.m. on June 18, 2015, Ms. Allen had already been transported to the hospital. Corporal Johnson's primary duty as a crime scene technician was to photograph the scene. His photographs of the bathroom showed feces on the floor in front of the toilet, on the bathtub, on the toilet paper holder, and on the wall. One photograph showed the toilet seat broken on both sides. He photographed what appeared to be blood on the

- 7 -

toilet seat, sink, and the bathtub. He also photographed a pink pillowcase in the bathtub and a sheet in the bedroom that were covered with feces. Numerous photographs of the scene were entered into evidence through Corporal Johnson.

Detective Fait testified that after the initial response by SPD officers to the 9-1-1 call, he was assigned to the case by his supervisor. The audio recording of the 9-1-1 call made by Defendant was played for the jury and entered as an exhibit without objection during Detective Fait's testimony. In the call, Defendant said that his wife just got home from "bar hopping" and that "she was bleeding out of her p***y and had s**t all over her." He said that his wife wanted him to take her to the hospital, but "he didn't have time." He stated that "she had her monthly the week before so that's not why she was bleeding." When asked if she was assaulted, he replied, "uh . . . she says . . . naw." When asked if she was intoxicated, he replied, "Oh yeah very." He confirmed that "she was breathing OK."

After being advised that Ms. Allen had been transported to StoneCrest, Detective Fait went to the Emergency Room where he conducted a video-recorded interview with Ms. Allen. The audio/video recording was played to the jury and entered as an exhibit without objection. Ms. Allen stated that she and Defendant left their house together at about 7:00 p.m. and "just kind of rode around." They ended up in Lebanon drinking at a bar named Whiskey River. She said that Defendant started acting "silly" and "jealous" because she is a "friendly person." They left Whiskey River about 11:00 p.m. or 12:00 a.m. She said that Defendant got into the backseat, and as she was driving, he started "grabbing [her] hair." She "sweet-talked him" into moving to the front seat. When he got out of the car, she "took off" because she did not want to be "tugged on" and she felt like it was a "bad situation." She then "went and hung out with some friends" at TNTs, a bar in Nashville. She said that the people at the bar were just acquaintances. She said that she got home about 3:00 or 3:30 a.m. and did not expect Defendant to be there. She said that Defendant followed her into the restroom, said that her panties were in her purse, and asked who she was "f***ing." She said that he "lost it" and "yanked" her off the toilet and put her on the floor between the toilet and the sink. She said that he was "checking" her to see if she had been with someone else and that he put his hand in her vagina and in her "butt." She said she did not remember much, but she remembered him "kind of rough-housing" her and grabbing her. She said that Defendant told her "you're bleeding, you're bleeding," and she said, "[W]ell, of course I am, because you just rammed your hand inside me." Detective Fait asked her what she remembered about a cut on her head and a bruise on her chin. She said that what she had told him was all she could remember. Detective Fait said that another officer found the toilet paper holder that had some blood and fecal matter on it. She denied that Defendant had used it to penetrate her, stating "no, he didn't" and "I don't think he used it. I'm pretty sure he didn't." Detective Fait asked about pillowcases with fecal matter on them found, and Ms.

Allen said that it was from Defendant "ramming his hand up in [her]." She told Defendant she was hurt, and Defendant told her he would call the paramedics. She said that she was lying down in the bedroom when the police arrived. She said that her jaw hurt and felt like it was "out of whack." She said that she knew her jaw injury happened while she was in the bathroom but that it was "all kind of a blur." She said that when her jaw "popped," she thought, "[O]h my [G]od, I need help." Detective Fait told her they were going to do a rape kit, and she said that she was "kind of in a relationship with someone else" and that her husband suspected it but did not know about it. She said that she was with this other man the day before, around 11:00 a.m., and that they had unprotected sex. She told Detective Fait that she "just wish[ed] he hadn't even called you guys" and that she did not want Defendant to be in trouble.

After the interview, Detective Fait first went to the Allens' home to view the scene and then went to the SPD station where he conducted a video-recorded interview of Defendant. The video-recorded interview was played for the jury and entered as an exhibit without objection. Before Detective Fait asked the first question, Defendant stated, "I want some DNA run on her, showing that some other d**k was up in there tonight that caused all the bleeding." Detective Fait confirmed that they would use a "rape kit" to collect any evidence, and Defendant said, "[T]hat's what I want." Defendant then said that Ms. Allen was "like that" when she got home at 4:00 a.m. He said that he called the ambulance because when she got home she was drunk, her "pu**y" was bleeding, she had "s**t" running out her "a**," and her "f***ing panties were in [her] damn pocketbook." He said, "[S]he bit me, and I smacked her." He showed his finger to Detective Fait where he said she bit him. Defendant continued, "[S]o I had to defend myself. She didn't like what I was saying because I called her a 'whore' and a 'f***ing slut.'"

Detective Fait then read Defendant his *Miranda* rights, and Defendant signed a written waiver. Defendant said that he "didn't call [9-1-1] just to be a dumbass" and that he was "hoping this would wake her a** up." Detective Fait told Defendant Ms. Allen's side of the story, and Defendant confirmed that they went to a bar in Lebanon and that Ms. Allen left him on the side of a road when he got out of the car to get in the front seat. He said that Ms. Allen was upset because he wanted to go home but she wanted to go to another bar. He said, "[T]he easiest way to keep from getting hit was to get in the back seat." He denied pulling her hair. Because Defendant did not have his phone when Ms. Allen left him on the side of the road, he had to flag down a vehicle and ask for a ride to Waffle House. Because Waffle House did not have a public phone, he went across the street to a gas station and called a cab. Defendant said that he arrived home between 2:00 and 2:30 a.m. He said that Ms. Allen was not home when he arrived and that he could not call her because his phone "was dead."

- 9 -

Defendant said that, when Ms. Allen got home, she went to the bathroom. When he checked on her, she was passed out sitting naked on the toilet. He asked her where she had been, and she replied, "[D]on't worry about it." He said that he saw that she had blood between her legs, he wiped near her genitals, and he said, "look you got blood on you." He said that he went back into the living room because he noticed that she did not have on panties. He looked for her phone and noticed that her panties were in her purse. He went back to the bathroom to confront her, and she "smacked" him. He said that he "went back to get her" and that she grabbed his hand and bit him. He hit her somewhere in the area of her face to get her "the f*** off [his] finger." He said that she fell off the toilet. Detective Fait asked Defendant about the four-inch laceration on the back of Ms. Allen's head. Defendant said it must have happened when she fell off the toilet because she landed between the toilet and the countertop. Detective Fait next asked about her black eye, the bruise on her chin, her dislocated jaw, and the visible choke marks on her neck. Defendant denied ever putting his hands around her neck or punching her. He said, "I probably touched her twice to get my hands back away from her." Detective Fait asked again about her head laceration, and Defendant said that, when he went into the kitchen, she was on the toilet. When he came back, she was on the floor between the toilet and the countertop. Defendant said that Ms. Allen then lay in front of the bathtub and asked for help. He described her as delirious and drunk; he refused to take her to the hospital but called 9-1-1. He said, "I wouldn't beat the hell out of her and then call an ambulance to pick her up."

Detective Fait told Defendant that the victim said he "checked her to see if she had been fooling around with anybody." He denied penetrating her. Defendant said that he "rubbed [his] hand right between her legs and came up with a frickin handful of blood." Defendant said that he asked Ms. Allen if she was raped. Defendant said that, when Ms. Allen saw the blood, she said, "[Y]ou['re] the one that done it" and started rubbing blood all over herself saying, "[Y]ou're going to jail motherf***er." Detective Fait asked again if Defendant checked her with his fingers, and Defendant shook his head no. Detective Fait asked about the fecal matter on the toilet paper holder, saying "that's been shoved in her ass." Defendant denied ever touching the toilet paper holder, saying "that's just wrong." Defendant said that, when he told Ms. Allen that the paramedics were coming, she said that she did not want to go to the doctor and got in bed.

Defendant said that he used Ms. Allen's cell phone to take pictures of her on the bathroom floor while she was "kicking and swinging." He said he wanted proof that she came home "looking like this." Near the conclusion of the interview, Defendant again asked Detective Fait to have the doctors do a "rape kit." At the end of the interview, Detective Fait told Defendant that the doctor found tearing and bruising and that he was being charged with rape.

Detective Fait then obtained an arrest warrant charging Defendant with aggravated rape and domestic assault. Defendant's preliminary hearing was scheduled for June 23, 2015.

On June 22, 2015, Ms. Allen sent Detective Fait two emails, which he read for the jury. The first email stated:

Detective Fait, I have left a couple of messages since Friday, but I have not heard back, so I thought I would follow-up with an email. I have replayed the events of last Wednesday a million times. [Defendant] did not rape me. After I left him, I went to another bar called TNT[s] in Nashville. I stupidly got into a vehicle with a guy from the bar. I do not know his name. He removed my panties and used his hands to penetrate me vaginally and anally. I can't remember if I said no at the time. I was very intoxicated. I know that when I realized what was going on, I got out of the car and came home. [Defendant] was angry because he found my panties in my purse, but he did not rape me. I have received my subpoena for Wednesday. I will be there at 1:00 p.m. Thanks. Kim[berly] Allen.

The second email stated:

Thank you for the phone call. Obviously[,] I would like to change this situation. Some things cannot be changed no matter what. Thank you for taking the time to chat with me. Thanks. Kim[berly] Allen.

The June 23, 2015 preliminary hearing was continued for reasons not made clear in the record. After the first continuance, Detective Fait went to TNTs, the bar mentioned by Ms. Allen in her first email, to see if they had a surveillance video of the night Ms. Allen said she was there, but the operator of the bar said their video was overwritten every twenty-four hours and was therefore not available.

Over the next several months, Detective Fait went to General Sessions Court six times concerning Defendant's case. After numerous continuances, the preliminary hearing was finally held March 18, 2016, nine months after the incident giving rise to the charges. By that time, Detective Fait was no longer employed by SPD. Detective Fait said that he chose to retire rather than be terminated for conduct unbecoming of an officer and for mishandling evidence in a different domestic case. He stated that, due to his retirement, he was unable to get the file to prepare for the preliminary hearing and that he was testifying from memory.

- 11 -

Detective Fait testified that he investigated approximately forty domestic violence cases per month. He testified that "[v]ery typically in a domestic violence case, in the heat of the moment the individual might want to prosecute, might not want to prosecute. So, officers would take the initiative and prosecute by the [s]tate law." He said that, often after "things have calmed down," a victim would contact him to see if the charges could be dropped. He would explain to the victim that the charges were taken out by the officer and that the officer was the one prosecuting the case, not the victim. When asked if this was "pretty common in domestic violence cases," Detective Fait answered: "Unfortunately, it was very common." He said that "once the warrant was issued, it had to go before the General Sessions Court."

On cross-examination, Detective Fait was questioned about his testimony at the preliminary hearing. Detective Fait agreed that he testified at the preliminary hearing (1) that Ms. Allen provided a statement that Defendant put "his entire hand" inside her vagina and anus (2) that Dr. Bell told Detective Fait that her injuries "were consistent with something tearing her vagina and anus," and (3) that Ms. Allen had not been sexually active earlier in the evening. Detective Fait could not recall if he actually spoke with Dr. Bell, explaining that, when the preliminary hearing finally took place nine months after he began his investigation, he was no longer employed by SPD and did not have access to his file. He said that he was testifying from memory at the preliminary hearing. He admitted that he told Defendant that he would have a rape kit performed but that he never requested that to be done. He said that Defendant showed him a bite mark on his hand and marks on his face. He agreed that he did not take pictures of Defendant's injuries even though he had a camera with him at the interview. He said that he never collected the panties that, according to Defendant, were in Ms. Allen's purse. He also said that he did not take swabs of Defendant's hands. Detective Fait admitted that, when he was asked during the preliminary hearing if Ms. Allen said anything about being sexually active earlier in the evening of June 17, he answered "no." He said that the information provided by Ms. Allen at the hospital was that she was sexually active with her boyfriend earlier that *morning* rather than with an unnamed third party earlier in the evening of June 17 or in the early morning hours of June 18.

Brenda Brown, Ms. Allen's aunt, testified that Ms. Allen telephoned her around 7:30 or 8:00 a.m. on June 18 after being discharged from the emergency room and asked her come to the Allens' house. When Ms. Brown arrived, she found Ms. Allen sitting on the couch. She had bruises on her neck, black eyes, and feces in her hair and on her face. Ms. Brown washed Ms. Allen's hair in the kitchen sink. Ms. Brown went to court with Ms. Allen "at least six or seven times," but the hearing kept being postponed. She said that Ms. Allen was nervous and was crying when they went to court.

Following Ms. Brown's testimony, the State played for the jury the audio recording of Ms. Allen's preliminary hearing testimony. Ms. Allen testified that she and Defendant drove to Whiskey River, a bar in Lebanon, on June 17, 2015. While there, she had "several shots of Jägermeister," and Defendant had "several shots of . . . Crown Royal." When asked on cross-examination how many is several shots of Jägermeister, she answered, "I don't even know." She also did not know "what really sparked" the argument that led to Defendant getting into the backseat when they left Whiskey River. She said that Defendant was angry and pulled her hair while she was driving. She said that she "told him to just come into the front seat, and that we would talk about whatever was going on." She stopped the vehicle, and when Defendant got out, she drove away and left him on the side of the road. She then "went to Nashville to a friend's bar called TNTs off of Nolensville Road." She arrived around "12:00, 12:30 maybe" and stayed there "[m]aybe an hour." She only had one shot of Jägermeister at TNTs. She went home after leaving TNTs and arrived around 1:30 or 2:00 a.m. She was not expecting Defendant to be home. She first saw Defendant when she went to use the bathroom. When asked if she went to the bathroom immediately when she got home, Ms. Allen answered:

> I mean, I did have my stuff with me, so I know that I stopped at the table, which is directly into the dining room. And then I just remember going to the restroom. I don't really remember anything between laying my stuff down and getting to the restroom.

She said that Defendant "came into the bathroom and was yelling at [her], basically asking where [she] had been and accusing [her] of being out with other people." She said that she had on a sundress and that Defendant "grabbed both sides of the straps of [her] sundress and pull[ed her] off of the toilet. And [her] dress just rip[ped] away -- and bra and everything just rip[ped] away." She remembered "falling backward and getting lodged between the toilet and the sink." Defendant "came in and was yelling at [her] and hitting [her] around [her] head." She said that Defendant "took [her] own feces and put it in [her] mouth. And it was all over the bathroom. It was just slung everywhere[.]" She thought Defendant hit her nine or ten times. She said that she had a black eye and bruises on her forehead.

She said that, a few days after going to the emergency room, she went to her primary care physician. She said that he conducted a full exam and found that she had a yeast infection from the foreign matter in her vagina. Her physician gave her Percocet for the pain. Ms. Allen said that she did not remember being choked or being penetrated anally with the toilet paper holder.

- 13 -

On cross-examination, Ms. Allen said that she and Defendant arrived at Whiskey River around 9:00 p.m. and stayed until around 11:00 or 12:00. She said that she arrived at TNTs around midnight and that it was the only bar she went to after leaving Whiskey River. She said that she only had one drink and did not stay long. She said that she left TNTs and drove straight home. She stated that she thought Defendant would still be in Lebanon. She said that the first time she remembered seeing Defendant was when she was in the restroom. She said that, when he came in, he was "pissed." Ms. Allen testified that Defendant said, "I'm going to check you," and then he "put his hand in [her] vagina." After the confrontation was over, she said that she "just tried to go to bed [] and just forget about it." She said that Defendant called for an ambulance to come to the house after she told him she was hurt and needed help.

She said that she did not "really remember much after that until the ambulance got there." Ms. Allen said that she was still under the influence of the alcohol but that she "sobered up pretty quickly" when the ambulance arrived. She said that she did not want to leave the house but that she went with the ambulance. She said that she did not remember Defendant taking pictures of her with her cell phone. She realized that he had taken pictures of her when she looked at her phone and "saw a couple of pictures." She said that she still had two of the pictures on her phone.

SPD Detective Allan Nabours testified that Ms. Allen's iPad was recovered during the investigation. The iPad was sent to Officer Darrell Putnam in Salt Lake City, Utah. Officer Putnam was able to obtain photographs of Ms. Allen lying nude on the bathroom floor that had been uploaded to the iPad from an iPhone. The photographs were entered as an exhibit.

At the conclusion of the State's proof, the State made an election of offenses for the aggravated rape charges in which it elected the alleged penetration of Ms. Allen's vagina in Count 1 and the alleged penetration of Ms. Allen's anus in Count 2.

Defendant testified that when he came home from work at approximately 6:00 p.m. Ms. Allen wanted to go for a ride in her new car. They stopped to buy a bottle of liquor and drove through the countryside. They arrived at Whiskey River at approximately 9:00 p.m. and remained there for about two and a half to three hours. Defendant said that he wanted to leave the bar to go home because he had to work the next morning. He testified that Ms. Allen "wasn't real thrilled about the thought of going home" and wanted to go to another bar. They began to argue, and when they left Whiskey River, he got in the backseat to "kind of just to keep peace." He claimed that, after Ms. Allen drove a short distance, she asked him to "sit in the front seat with her." Ms. Allen pulled over, and when Defendant stepped out of the car, she drove away and left him "on a two-lane highway out in Lebanon." He said that, after four or five cars

- 14 -

failed to stop, he was finally able to wave somebody down. The driver dropped him off at Waffle House. He ate breakfast and called a cab from a pay phone across the street. The cab took him back to Smyrna. Ms. Allen was not there when he arrived, so he went to bed. When he awoke, he went to see if Ms. Allen was home and found "her sitting on the toilet passed out." He said she was nude. He asked her if she was okay, and "she started hollering, you know, leave me alone, leave me alone." He walked to the kitchen and saw "her panties in her purse." He returned to the bathroom and asked why her panties were "draped over the top of her purse." Defendant testified that they were both yelling at each other and that he asked her "who she had been with, what she had been doing, why she had stayed out." He said that he put his hand on her thigh and noticed blood. The argument "escalated," and he claimed that Ms. Allen bit his finger and that they "got into a big scuffle." He admitted that they hit each other. After Ms. Allen fell to the floor, Defendant got her cell phone to "take a picture of her laying there in the floor in the condition she was in." Defendant testified that he was the one who told Detective Fait about the pictures. Defendant called 9-1-1 and told the operator that Ms. Allen had vaginal bleeding. Defendant denied that he penetrated Ms. Allen vaginally or anally. He said he told Detective Fait that he ran his hand up her thigh and "through her slit" checking for blood.

On cross-examination, Defendant admitted that the "altercation started" after he found Ms. Allen's panties in her purse. He said that he accused her of "slutting around and whoring around on [him]." He said that they got into "a confrontation face-to-face" and that she bit his finger. He claimed that "out of reaction of my finger being in her mouth, I smacked her." He said that she started screaming, "I need to go to the hospital, I need to go to the hospital." He said that "she fell off the toilet" and "fell onto the countertop." He said that, when he came back with the camera, "she was kicking and swinging" and "rolling around in the floor, because she didn't want her picture t[aken]." He claimed he never rubbed feces on her.

### E. Verdict

The jury convicted Defendant of one count of aggravated rape involving the penetration of Ms. Allen's vagina and one count of domestic assault involving bodily injury and found Defendant not guilty of the second count of aggravated rape involving the penetration of Ms. Allen's anus. The State entered a nolle prosequi on one count of domestic assault before trial.

## F. Sentencing

Following a sentencing hearing, the trial court sentenced Defendant to twenty years at one hundred percent service for aggravated rape and to a concurrent term of eleven months and twenty-nine days for domestic assault.

## G. Motion for New Trial and Amended Motion for New Trial

Defendant filed a timely Motion for New Trial, which basically reserved the right to file an amended motion after the transcript was completed. In the Amended Motion for New Trial, Defendant raised several grounds, including that the State by withholding highly exculpatory evidence kept the Defendant's counsel from having a meaningful cross-examination. After the trial court denied the Amended Motion for New Trial, Defendant filed a timely notice of appeal.

## II. Analysis

On appeal, Defendant claims that: (1) the State "violated his due process rights pursuant to *Brady*" by failing to disclose the existence of exculpatory emails prior to the preliminary hearing, and the trial court violated his due process rights by improperly admitting Ms. Allen's preliminary hearing testimony; (2) the trial court admitted improperly authenticated photographs into evidence, which forced Defendant to testify to explain the photographs to the jury; (3) the prosecution improperly referred to Ms. Allen as "victim" numerous times during the course of the trial in violation of the trial court's pretrial order and bench conference ruling and made improper comments on the veracity of witnesses and mischaracterized evidence during closing argument; (4) the trial court erred in not allowing Defendant to question Detective Fait about the specific reasons for his termination of employment with the SPD; (5) the trial court erred in making Defendant and his counsel switch tables after the jury pool had already seen them sitting at one table; (6) the evidence was insufficient to support the verdicts of the jury; and (7) the cumulative effect of these issues denied Defendant his due process right of a fair trial.

The State responds that (1) Defendant waived his due process claim; (2) the photographs were properly admitted; (3) Defendant is not entitled to plain error relief concerning the prosecutor's argument, and alternatively, the prosecutor's argument was not improper; (4) the trial court acted within its discretion when it limited the cross-examination of Detective Fait; (5) the trial court acted within its discretion when, based on the local custom and practice, it required Defendant to switch tables with the State; (6) the evidence was sufficient to support the convictions; and (7) Defendant is not entitled to relief due to cumulative error.

## A. Waiver

We will begin our analysis by addressing the State's argument that Defendant waived his due process claim "by failing to raise or litigate a *Brady* violation in the trial court" or in his Amended Motion for New Trial. In the trial court, Defendant moved to exclude Ms. Allen's preliminary hearing testimony based on the Confrontation Clause of the federal and state constitutions and pursuant to Tennessee Rule of Evidence 804. On appeal, Defendant claims that the State "violated his due process rights pursuant to *Brady*" by failing to disclose the existence of exculpatory emails prior to the preliminary hearing and that the trial court violated his due process rights by improperly admitting Ms. Allen's preliminary hearing testimony. As the State correctly argues, neither Defendant's Motion to Exclude nor Amended Motion for New Trial specifically mentioned *Brady* or due process.

The second issue in the Amended Motion for New Trial stated that

> the [c]ourt erred in that it allowed the preliminary hearing of the alleged victim to be played to the jury when the [c]ounsel for Defendant did not have a meaningful cross[-]examination of the alleged victim because the State had in its possession an email from the alleged victim [stating] that she had sexual relations with another man on the night of the alleged rape and that Defendant did not do this to her. That *withholding this highly exculpatory evidence* kept the Defendant's counsel from having a meaningful cross-examination. The [c]ourt erred in allowing it to be admitted, as it *was highly prejudicial.* (emphasis added).

"Raising an issue in a motion for new trial allows the trial court to consider or reconsider the issue and make an appropriate ruling." *State v. Harbison*, 539 S.W.3d 149, 164 (Tenn. 2018). A motion for new trial "should identify the specific circumstances giving rise to the alleged error so that it may be reasonably identified in the context of the entire trial." *Fahey v. Eldridge*, 46 S.W.3d 138, 143 (Tenn. 2001). "The contents of the motion [for new trial] should direct the attention of the trial court and prevailing party to the asserted error, and the movant should specify the issues with sufficient certainty to enable the appellate court to determine whether the issue was first raised in the trial court." *Harbison*, 539 S.W.3d at 164 (citing *Waters v. Coker*, 229 S.W.3d 682, 689 (Tenn. 2007). However, "precise citation to a rule, statute, or case as the legal ground for the alleged error is normally not required to preserve the issue for appeal under [Tennessee] Rule [of Appellate Procedure] 3(e)[.]" *Fahey*, 46 S.W.3d at 143.

We determine that using language concerning the State's withholding of "exculpatory evidence" in the Motion to Exclude and in the Amended Motion for New Trial was sufficient to bring the legal nature of the error to the attention of the trial court and was of "sufficient certainty" to enable this court to determine that "the issue was first raised in the trial court." *Harbison*, 539 S.W.3d at 164. We determine that the issue concerning a *Brady* violation and accompanying due process claim is not waived.

## B. Standard of Proof

A defendant has the burden of proving a constitutional violation by a preponderance of the evidence. *State v. Spurlock*, 874 S.W.2d 602, 610 (Tenn. Crim. App. 1993).

## C. Confrontation and Due Process

The Confrontation Clause of the Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. "The fundamental right of confrontation applies through the Fourteenth Amendment to the states." *State v. Cannon*, 254 S.W.3d 287, 301 (Tenn. 2008); *see McDonald v. Chicago*, 561 U.S. 742, 764-765 (2010). Article I, section 9 of the Tennessee Constitution also guarantees this right of confrontation, providing "[t]hat in all criminal prosecutions, the accused hath the right to . . . meet the witnesses face to face[.]" Tenn. Const. Art. I, § 9. "[O]ne of the important objects of the right of confrontation was to guarantee that the fact finder had an adequate opportunity to assess the credibility of witnesses." *Berger v. California*, 393 U.S. 314, 315 (1969).

"[T]he principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure, and particularly its use of ex parte examinations as evidence against the accused." *Crawford v. Washington*, 541 U.S. 36, 50 (2004). A second principle of the Confrontation Clause was to prohibit "admission of testimonial statements of a witness who did not appear at trial unless [the witness] was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Id.* at 53-54. *Crawford* made it clear that, in regard to testimonial statements, the Confrontation Clause "commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination." *Id.* at 61. As Justice Scalia emphasized, "Where testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." *Id.* at 68-69.

Tennessee Rule of Evidence 804 governs the hearsay exception regarding unavailable witnesses. Rule 804(a) provides the criteria to determine when a witness is unavailable. Rule 804(a)(4) states the obvious: that a witness who "cannot be present or testify at the trial or hearing because of death" is an unavailable witness. Tennessee Rule of Evidence 804(b)(1) provides that "[t]estimony given as a witness at another hearing of the same or a different proceeding" is not excluded by the hearsay rule "if the declarant is unavailable" and "if the party against whom the testimony is now offered had both an opportunity and a similar motive to develop the testimony by direct, cross, or redirect examination." "Former testimony may not be introduced under [Federal Rule of Evidence] Rule 804(b)(1) without a showing of "similar motive." *United States v. Salerno*, 505 U.S. 317, 317 (1992). Because Tennessee Rule of Evidence Rule 804(b)(1) has the same "opportunity and a similar motive" language as the federal rule, we determine that former testimony may not be introduced under Tennessee Rule of Evidence Rule 804(b)(1) without a showing of "similar motive." However, as Justice Scalia warned in *Crawford*, "Leaving the regulation of out-of-court statements to the law of evidence would render the Confrontation Clause powerless to prevent even the most flagrant inquisitorial practices." 541 U.S.at 51. The "denial or significant diminution" of the right to cross-examine a witness "calls into question the ultimate 'integrity of the fact-finding process' and requires that the competing interest be closely examined." *Chambers v. Mississippi*, 410 U.S. 284, 295 (1973) (quoting *Berger v. California*, 393 U.S. 314, 315 (1969)).

In *State v. Howell*, our supreme court stated:

> In addition to protecting a defendant's right to confront the witnesses at the time of trial, the state and federal confrontation clauses also guarantee to the defendant "an opportunity for *effective* cross[-]examination," *Delaware v. Fensterer,* 474 U.S. 15, 20 (1985), so that the defendant can "expose to the jury the facts from which jurors . . . [can] appropriately draw inferences relating to the reliability of the witness." *Davis v. Alaska*, 415 U.S. 308, 318 (1974) (emphasis added).

868 S.W.2d 238, 252 (Tenn. 1993).

The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law[.]" U.S. Const. amend. XIV. Due process requires that criminal prosecutions "comport with prevailing notions of fundamental fairness." *California v. Trombetta*, 467 U.S. 479, 485 (1984).

In the context of a criminal trial, the purpose of both the Confrontation Clause and the Due Process Clause of the United States Constitution is to guarantee every criminal defendant the right to a fair trial. *See Bullcoming v. New Mexico*, 564 U.S. 647, 663 (2011); *Johnson v. State*, 38 S.W.3d 52, 55 (Tenn. 2001); *State v. Ferguson*, 2 S.W.3d 912, 915 (Tenn. 1999). The rights guaranteed by the Confrontation Clause and the Due Process Clause are sometimes entwined, and the right of confrontation is sometimes subsumed by the right to due process. *See Chambers*, 410 U.S. at 294 ("The rights to confront and cross-examine witnesses and to call witnesses on one's own behalf have long been recognized as essential to due process.")

## D. *Brady*

The prosecution's affirmative duty to disclose evidence favorable to a defendant has its origins in the "early 20th-century strictures against misrepresentation and is of course most prominently associated with [the Supreme] Court's decision in *Brady*[.]" *Kyles v. Whitley*, 514 U.S. 419, 432 (1995). In 1963, the Supreme Court in *Brady* held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87.

## E. Prerequisites for a *Brady* Violation

*State v. Edgin* involved a general request for *Brady* information. 902 S.W.2d 387 (Tenn. 1995), *as amended on reh'g* (July 10, 1995). Mr. Edgin claimed that the State suppressed a pretrial statement by one of the two minor victims that was favorable to him. *Id.* at 389. The Tennessee Supreme Court noted that, even if it assumed that the State suppressed a favorable pretrial statement, Mr. Edgin would still "have to demonstrate the materiality of the statement" to prove a constitutional violation under *Brady*. *Id.* The Court held that four prerequisites must be satisfied to establish a *Brady* violation:

> 1. The defendant must have requested the information (unless the evidence is obviously exculpatory, in which case the State is bound to release the information whether requested or not);
>
> 2. The State must have suppressed the information;
>
> 3. The information must have been favorable to the accused; and
>
> 4. The information must have been material.

*Id.*[2]

We will examine the four prerequisites for a *Brady* violation set out in *Edgin*.

### a. Duty to Disclose

In *Brady*, the prosecution's duty to disclose "evidence favorable to an accused" was triggered upon request by the accused. In *Agurs*, the Court determined that "the obviously exculpatory character of certain evidence in the hands of the prosecutor" triggered a duty to disclose even if no request had been made. *Agurs*, 427 U.S. at 104.

We agree with the trial court's reasoning expressed during the hearing on Motion to Exclude that the first email was "obviously exculpatory" and that the State was "bound to release the information whether requested or not." The first prerequisite for a *Brady* violation is satisfied.

### b. Suppression

In its brief, the State claims that, "[e]ven if this [c]ourt were to find that [D]efendant raised a *Brady* claim in the trial court, [Defendant's] contention is meritless because *Brady* [] does not apply to preliminary hearings." The State bases its argument in part on what it characterizes as "well-established caselaw" holding that Tennessee Rule of Criminal Procedure 16, the rule governing discovery, does not apply in General Sessions Court. *See State v. Willoughby*, 594 S.W.2d 388, 390 (Tenn. 1980); *State v. Stanley Phillip Chapman*, No. W2004-02404-CCA-R3-CD, 2005 WL 2878162, at *5 (Tenn. Crim. App. Nov. 2, 2005, *perm. app. denied* (Tenn. Mar. 27, 2006). The Advisory Commission Comment to Rule 16 states:

> This rule is not the exclusive procedure for obtaining discovery, since discovery required by due process is not expressly structured into the rule. For example, for the rule as to the [S]tate's duty to disclose exculpatory

---

[2] In its original opinion, our supreme court applied the materiality standard adopted in *United States v. Agurs*, 427 U.S. 97, 104 (1976), holding modified by *United States v. Bagley*, 473 U.S. 667 (1985), to determine there was no *Brady* violation. *Id.* at 389-390.

Shortly before the issuance of the original *Edgin* opinion, the United States Supreme Court issued *Kyles*. Thereafter, our supreme court granted Mr. Edgin's petition to rehear. In its opinion on the petition to rehear, the court recognized that the standard of "materiality" that it used in its original *Edgin* opinion was incorrect under *Kyles*, but determined that *Kyles* did not change the prerequisites for a *Brady* violation set out it its original opinion. *Id.* at 390. The court amended its opinion "to adopt the standard of 'materiality' announced in *Kyles*" but denied the petition to rehear "as to all other matters." *Id.* at 391.

- 21 -

evidence, *see Brady* [].  The voluntary disclosure of evidence not within the ambit of this rule is encouraged by the commission.

Tenn. R. Crim. P. 16, Adv. Comm'n Cmt.  Thus, the State's duty to disclose exculpable information is governed by *Brady* and its progeny, not by Tennessee Rule of Criminal Procedure 16.

The State also argues that "[f]ederal courts have stated that '*Brady* itself was never intended to apply to pre[]trial proceedings,'" and that "*Brady* does not apply to preliminary hearings," citing two federal cases that were not selected for publication in the Federal Reporter, *Gov't of Virgin Islands in Interest of N.G*, 34 F. Appx. 417, 419 (3d Cir. 2002) and *Jaffe v. Brown*, 473 Fed. Appx. 557, 559 (9th Cir. 2012).  Neither of these federal cases hold that *Brady* can *never* apply to pretrial proceedings or a preliminary hearing.

The State also relies on two unpublished Tennessee opinions, *State v. Christopher Terrell Shipp*, No. M2016-01397-CCA-R3-CD, 2017 WL 4457595, at *1 (Tenn. Crim. App. Oct. 5, 2017), *perm. app. denied* (Tenn. Feb. 14, 2018), and *State v. Stanley Phillip Chapman*, No. W2004-02404-CCA-R3-CD, 2005 WL 2878162, at *1 (Tenn. Crim. App. Nov. 2, 2005), *perm. app. denied* (Tenn. Mar. 27, 2006), to support its argument that the State was not required to disclose exculpatory information to Defendant before his preliminary hearing.

In *Stanley Phillip Chapman*, after the preliminary hearing but before trial, the State disclosed that the defendant's five-year-old-son made a statement to the police "indicating that the shooting of the victim was accidental."  2005 WL 2878162, at *5. The trial court determined that the defendant's son's statement was admissible as an excited utterance, allowed the State to call the defendant's son to testify at trial, and allowed defense counsel to cross-examine the defendant's son about his statement.  *Id.* at *19-20.  We conclude that the facts in *Stanley Phillip Chapman* are distinguishable from the facts in this case because the defendant's son, unlike Ms. Allen, was available to testify and be cross-examined at the trial about his prior statement.  The jury was therefore able to consider both the defendant's son's prior statement to police and his testimony at trial and could use that evidence to determine the credibility of the defendant's son.

*Christopher Terrell Shipp* is the only Tennessee case cited by the State or found by this court in which the State did not disclose the statement of a victim that contained exculpable information prior to the victim testifying at the preliminary hearing and the State introduced the preliminary hearing testimony at trial because the victim died before trial.  During her testimony at the preliminary hearing, the victim identified the defendant

as the perpetrator of a robbery during which she was wounded and her boyfriend was killed. *Christopher Terrell Shipp*, 2017 WL 4457595, at *1.

In *Christopher Terrell Shipp*, the victim testified at the preliminary hearing that she knew the defendant as "Chris," "had known him for a year or longer," and "had seen him 'nightly' because he bought marijuana" from her boyfriend. *Id*. The victim also picked the defendant "out of a photographic lineup and testified [at the preliminary hearing] that she had no doubt he was the shooter." *Id*. at *2. Included in the discovery provided to the defendant after the preliminary hearing was a police report which stated that the victim had described defendant as having "a facial tattoo." *Id*. at *1 The defendant objected to the use of the victim's preliminary hearing testimony, arguing that he did not have an adequate opportunity to cross-examine the victim about her statement regarding the tattoo. *Id*. The trial court denied the defendant's motion. At trial, the detective who took the victim's statement testified that the victim said that the perpetrator had a facial tattoo but that the victim could not describe the tattoo. *Id*. at *2. The detective acknowledged that the defendant, who was present in the courtroom, did not have a facial tattoo. *Id*. The detective testified that the defendant had a discoloration, which he described as "shadowing close to his cheek bones and facial hair." *Id*.

On appeal, the defendant claimed that the victim's preliminary hearing testimony "should have been excluded under Tennessee Rule of Evidence 804 and the Confrontation Clause of the United States and Tennessee Constitutions" because he did not have an adequate opportunity to cross-examine the victim about her statement regarding the tattoo. *Id*. at *5. This court noted that "the primary issue at the preliminary hearing was the same as the primary issue at trial: the identity of the [d]efendant as the perpetrator" and that the defendant's counsel extensively cross-examined the victim at the preliminary hearing. *Id*. at *7. This court concluded that the defendant "had a similar motive and a prior opportunity to confront the witness" and "that his right to confrontation was not violated." *Id*. at *7.

Although *Christopher Terrell Shipp* only addressed an alleged Confrontation Clause violation, we believe the opinion still has precedential value to a due process claim because, as we have stated previously in this opinion, "[t]he right[] to confront and cross-examine witnesses [has] long been recognized as essential to due process." *Chambers*, 410 U.S. at 294.

We discussed above the factual similarities between *Christopher Terrell Shipp* and this case. There are, however, significant differences. In *Christopher Terrell Shipp*, the exculpatory information concerning the defendant's facial tattoo was one detail in the identification of the defendant as the perpetrator. The jury could consider the victim's statement concerning the facial tattoo and the detective's testimony that the defendant did

not have a facial tattoo in determining whether the victim was lying or simply mistaken. The jury had evidence it could use in determining the credibility of victim.

In this case, what Ms. Allen stated in the first email—that Defendant did not rape her and that another man did—could not have simply been a mistake made by Ms. Allen. Ms. Allen was either telling the truth or lying in that email. If she was telling the truth in the email, then she was lying in her preliminary hearing testimony. If she was telling the truth in her testimony, she was lying in her email. Because the prosecution suppressed the obviously exculpatory first email until after Ms. Allen's death, Defendant was never able to question Ms. Allen about its veracity. We distinguish *Christopher Terrell Shipp* based on this difference.

We agree with the State's argument that "*Brady* generally does not apply to delayed disclosure of exculpatory information, but only to a complete failure to disclose." *United States v. Davis*, 306 F.3d 398, 421 (6th Cir. 2002) (internal quotation marks omitted); *State v. Justin Terrell Knox*, No. W2014-01577-CCA-R3-CD, 2015 WL 6122257, at *4 (Tenn. Crim. App. Oct. 16, 2015), *perm. app. denied* (Tenn. Mar. 24, 2016). "Delay only violates *Brad*y when the delay itself causes prejudice." *United States v. Bencs*, 28 F.3d 555, 561 (6th Cir. 1994). Based on our reading of *Kyles*, the government's delayed disclosure of obviously exculpatory information in its possession can result in a *Brady* violation requiring a reversal of a conviction if the delay itself causes prejudice to the defendant by putting "the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 434.

In her dissenting opinion in *State v. Caughron*, 855 S.W.2d 526 (Tenn. 1993), Justice Daughtrey stated the following about suppression of *Brady* material:

> Although the complete non-disclosure of significant exculpatory evidence often makes an easy case for a due process violation, delayed disclosure requires an inquiry into whether the delay prevented the defense from using the disclosed material effectively in preparing and presenting the defendant's case.

*Id.* at 548 (Daughtrey, J., dissenting).

Here, the emails were obviously exculpatory, and the State had a duty to disclose them without a request by Defendant. Although the State provided the emails in discovery before trial, it suppressed the emails for over two years during which time Ms. Allen died. The second prerequisite for a *Brady* violation is satisfied.

## c. Favorability

An alleged victim recanting and saying that the person accused of an offense did not commit the offense and that another person did is certainly favorable. The third prerequisite for a *Brady* violation is satisfied.

## d. Materiality

"A fair analysis of the holding in *Brady* indicates that implicit in the requirement of materiality is a concern that the suppressed evidence might have affected the outcome of the trial." *Agurs*, 427 U.S. at 104. Since the issuance of *Brady* in 1963, the Supreme Court, in a series of prominent cases, has continued to define the prosecutor's duty to disclose favorable information, especially in regard to the character of the evidence that must be disclosed and the standard of materiality.

In *Giglio v. United States*, 405 U.S. 150, 154 (1972), the Court determined that the duty to disclose applied not only to exculpatory evidence but also to evidence that could be used to impeach the credibility of a key witness for the prosecution. In *Agurs*, the Court determined that "the obviously exculpatory character of certain evidence in the hands of the prosecutor" triggered a duty to disclose even if no request had been made by a defendant. *Agurs*, 427 U.S. at 107.[3] Concerning materiality, the *Agurs* Court stated:

> The proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt. Such a finding is permissible only if supported by evidence establishing guilt beyond a reasonable doubt. It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt.

*Id.* at 112-13.

To determine when evidence is material under *Brady*, the Supreme Court in *Bagley* adopted the *Strickland* reasonable probability standard used in post-conviction

---

[3] The responsibility to provide exculpatory information "remains regardless of any failure by the police to bring favorable evidence to the prosecutor's attention." *Kyles*, 514 U.S. at 420.

cases involving the ineffective assistance of counsel that the *Strickland* court itself formulated from the standard in *Agurs*. *See Strickland v. Washington*, 466 U.S. 668, 669 (1984) ("A reasonable probability is a probability sufficient to undermine confidence in the outcome.")  The *Bagley* court held that evidence withheld by the government is "material," as would require reversal of conviction, "only if there is reasonable probability that, had the evidence been disclosed to defense, the result of [the] proceeding would have been different."  *Bagley*, 473 U.S. at 682.

In *Kyles*, the Court emphasized the importance of the adjective "reasonable" in the "'reasonable probability' of a different result" standard of materiality adopted in *Bagley*:

> *Bagley*'s touchstone of materiality is a "reasonable probability" of a different result, and the adjective is important.  The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.  A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."

*Kyles*, 514 U.S. at 434 (internal citation omitted).

In 2001, the Tennessee Supreme Court stated the following about the test of materiality under *Brady*:

> Despite the language of probabilities used in our cases, however, it must be emphasized that the test of materiality is not whether the defendant would more likely than not have received a different verdict had the evidence been disclosed.  *See Strickler v. Greene*, 527 U.S. 263, 275 (1999).  Nor is the test of materiality equivalent to that of evidentiary sufficiency, such that we may affirm a conviction or sentence when, "after discounting the inculpatory evidence in light of the undisclosed evidence, the remaining evidence is sufficient to support the jury's conclusions."  *Id.*; *Kyles v. Whitley*, 514 U.S. 419, 435 n. 8 (1995) ("This rule is clear, and none of the *Brady* cases has ever suggested that sufficiency of evidence (or insufficiency) is the touchstone [of materiality]").  Instead, a reviewing court must determine whether the defendant has shown that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine the confidence of the verdict."  *Irick v. State*, 973 S.W.2d 643, 657 (Tenn. Crim. App. 1998) (citing *Edgin*, 902 S.W.2d at 390); *see also Strickler*, 527 U.S. at 290.  In other words, evidence is

material when, because of its absence, the defendant failed to receive a fair trial, "understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434.

*Johnson*, 38 S.W.3d at 58.

Because the prosecution failed to disclose the emails before the preliminary hearing and because Ms. Allen died before she could testify at trial, the jury was never able hear what Ms. Allen would have said about the emails. The jury did hear Detective Fait's testimony that, "[v]ery typically in a domestic violence case, in the heat of the moment the individual might want to prosecute, might not want to prosecute" and that, often after "things have calmed down," a victim would contact him to see if the charges could be dropped. The jury also heard Detective Fait explain that the charges were taken out by the officer and that the officer was the one prosecuting the case, not the victim, and that, "once the warrant was issued, it had to go before the General Sessions Court." In determining the credibility of Ms. Allen, the jury could speculate that this was a typical domestic violence case and that, "after things calmed down," Ms. Allen sent the emails to Detective Fait because she did not want to prosecute. However, there was no direct evidence that this was the case with Ms. Allen. Only Ms. Allen could testify about the reasons she sent the emails to Detective Fait and whether her statements in the emails were true. The jury was deprived of Ms. Allen's testimony concerning the emails because the State delayed disclosure of the emails until after her death. "The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend." *Napue v. Illinois*, 360 U.S. 264, 269 (1959). Ms. Allen was the key witness for the State, and her testimony was essential to the State's case. The obviously exculpatory information was material. The fourth prerequisite for a *Brady* violation is satisfied.

### F. *Brady* Violation and Defendant's Right to Fair Trial

As stated previously, "[d]elay only violates *Brady* when the delay itself causes prejudice." *Bencs*, 28 F.3d ay 561. Prejudice is shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial." *Kyles*, 514 U.S. at 434. If the emails had been disclosed before the preliminary hearing or if Ms. Allen had been alive at the time of the trial, she may very well have testified that the emails were not true. However, she could have testified the emails were true. Like the jury, we can never know what her testimony would have been. In this case, it was the delay itself that caused prejudice; during the delay, Ms. Allen died, and as a result of her death, Defendant was deprived of the opportunity to cross-examine her about the emails and the jury was deprived of Ms. Allen's testimony concerning the emails.

Defendant has proven that the State committed a *Brady* violation. We hold that, under the facts of this case, the State's failure to furnish obviously exculpatory information in its possession before the preliminary hearing, coupled with the death of Ms. Allen, the State's key witness, before Defendant was aware of the emails and before the Defendant had an opportunity to cross-examine Ms. Allen to determine the truthfulness of the emails, violated Defendant's right to due process and deprived Defendant of a fair trial. Accordingly, we reverse Defendant's convictions and remand for a new trial. It is axiomatic that nothing can cure the deficiency in Ms. Allen's preliminary hearing testimony caused by the State's failure to disclose the obviously exculpatory email prior to Ms. Allen's death. *See Larry McKay v. State*, No. W2008-02274-CCA-R3-PD, 2010 WL 2384831, at \*8 (Tenn. Crim. App. June 15, 2010) citing *State v. Sidney Ewing*, No. 01C01-9612-CR-00531, 1998 WL 321932, at \*8 (Tenn. Crim. App. June 19, 1998), *opinion vacated and reentered*, No. 01C01-9612-CR-00531, 1998 WL 485614 (Tenn. Crim. App. Aug. 18, 1998). Because of the *Brady* violation, no future jury will be able to hear what Ms. Allen would have stated concerning the veracity of the email and Ms. Allen's preliminary hearing testimony will not be admissible in a new trial.

To be clear, we are not holding that obviously exculpatory information *must* be provided before the preliminary hearing or before trial. However, when the State delays disclosure of obviously exculpatory information in its possession, the State risks violating *Brad*y when the delay itself causes prejudice by preventing "the defense from using the disclosed material effectively in preparing and presenting the defendant's case." *Caughron*, 855 S.W.2d at 548 (Daughtrey, J., dissenting).

### B. Photographs

Defendant claims that the trial court admitted improperly authenticated photographs into evidence, which forced Defendant to testify to explain the photographs to the jury. "[T]he admissibility of photographs lies within the discretion of the trial court," whose ruling "will not be overturned on appeal except upon a clear showing of an abuse of discretion." *State v. Banks*, 564 S.W.2d 947, 949.

### 1. Relevance

In order to be admitted into evidence, a photograph must be relevant to an issue that the jury must decide. *State v. Thomas*, 158 S.W.3d 361, 394 (Tenn. 2005); *see also* Tenn. R. Evid. 402. "[E]vidence is relevant if it helps the trier of fact resolve an issue of fact." *State v. James*, 81 S.W.3d 751, 757 (Tenn. 2002) (quoting Neil P. Cohen, et al., Tennessee Law of Evidence § 4.01[4], at 4-8 (4th ed. 2000)); *see also* Tenn. R. Evid. 401. However, Rule 403 of the Tennessee Rules of Evidence provides, "Although

relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." "Unfair prejudice" is defined as "[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Banks*, 564 S.W.2d at 951 (quoting Advisory Committee Note to Federal Rule of Evidence 403).

The photographs of the scene taken by Corporal Johnson and the photographs of Ms. Allen taken by Defendant were relevant to both the assault charge and the aggravated rape charge. The trial court did not abuse its discretion in determining that the photographs were relevant and that the probative value of the photographs was not substantially outweighed by the danger of unfair prejudice.

## 2. Authentication

Rule 901 of the Tennessee Rules of Evidence states that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims." Tenn. R. Evid. 901(a). Authentication can be accomplished through testimony of a witness with knowledge "that a matter is what it is claimed to be." *See* Tenn. R. Evid. 901(b)(1). "Once this foundation has been established, the 'trier of fact then makes the ultimate decision of whether the item is actually what it purports to be.'" *State v. Edward Lee Adkins*, No. M2009-00528-CCA-R3-CD, 2010 WL 3489170, at *2 (Tenn. Crim. App. Aug. 25, 2010) (quoting Neil P. Cohen et al., *Tennessee Law of Evidence* § 9.01[2][a] (5th ed. 2005)), *perm. app. denied* (Tenn. Jan 13, 2011).

In his statement to Detective Fait, Defendant said that he used Ms. Allen's iPhone to photograph her on the bathroom floor on the morning of the incident giving rise to the offenses. Detective Nabours testified that an iPad was recovered in March 2016. Officer Putnam, who at that time had relocated out of state, "dumped" the iPad. Detective Fait testified that the only modification of the photographs occurred when they were moved from one device to another by Officer Putnam in May of 2017. Detective Nabours testified that law enforcement found the photographs on Ms. Allen's iPad and that the photographs' properties showed that they were taken on an iPhone 6 on June 18, 2015, at 4:33 and 4:34 a.m., the morning of the alleged offenses. In allowing the admission of the photographs, the trial court noted that Defendant admitted during his police interview that he photographed Ms. Allen with her iPhone on the morning of the alleged offenses and that the data for the photographs showed that their dates and times were identical to the dates and times referenced in Defendant's pretrial statement. The circumstances regarding the photographs "reasonably establish[ed] the identity and integrity of the

evidence." *State v. Cannon*, 254 S.W.3d 287, 296 (Tenn. 2008). The trial court did not abuse its discretion in finding that the photographs were properly authenticated.

### 3. Right Against Self-Incrimination

The only authority cited by Defendant to support this issue was *State v. Blackstock*, 19 S.W.3d 200, 207 (Tenn. 2000). As to self-incrimination, *Blackstock* simply states that the Fifth Amendment to the United States Constitution provides that "[n]o person . . .shall be compelled in any criminal case to be a witness against himself." *Id.* at 207. As stated above, we determine that the trial court did not abuse its discretion in admitting the photographs. Defendant fails to cite any authority supporting an argument that the right against self-incrimination can be violated by the proper admission of evidence.

## C. Improper Prosecutorial Argument

Defendant claims that he "was denied a fair trial due to improper prosecutorial argument during closing argument, and throughout the trial." We will divide Defendant's claims into (1) the State referring to Ms. Allen as "victim" during trial and during closing arguments, and (2) other allegedly improper statements made by the State during closing arguments.

The State argues that Defendant is not entitled to relief because "he (1) cannot show that the State's use of the term 'victim' was improper or prejudicial and (2) did not contemporaneously object during closing argument, request plain error review, or establish that he is entitled to plain error relief."

"In determining whether statements made in closing argument constitute reversible error, it is necessary to determine whether the statements were improper and, if so, whether the impropriety affected the verdict." *State v. Pulliam*, 950 S.W.2d 360, 367 (Tenn. Crim. App. 1996). In *Judge v. State*, 539 S.W.2d 340 (Tenn. Crim. App. 1976), this court listed the following factors to be considered when determining whether the improper conduct of a prosecutor affected the verdict to the prejudice of the defendant:

(1) [t]he conduct complained of viewed in context and in light of the facts and circumstances of the case[;]

(2) [t]he curative measures undertaken by the court and the prosecution[;]

(3) [t]he intent of the prosecutor in making the improper statement[;]

(4) [t]he cumulative effect of the improper conduct and any other errors in the record[; and]

(5) [t]he relative strength or weakness of the case.

*Id.* at 344.

### 1. Reference to Ms. Allen as "Victim"

One of the pretrial motions filed by Defendant sought to exclude reference to Ms. Allen as "victim," arguing that "to use the term, such as victim, allows the focus to shift to the accused rather than remain on the proof of every element of the crime that the State is alleging." After argument, the trial court took the matter under advisement and, by order entered January 23, 2018, ruled:

On [D]efendant's Motion to Exclude Use of Prejudicial Terms, [D]efendant requested the [c]ourt prohibit the State from the use of prejudicial terms at trial, to include using the term "victim" when referring to the alleged victim in this case. At the hearing, defense counsel was unable to cite any authority in support of his motion. It is well settled that it is acceptable to refer to a victim of a crime as the "alleged victim." Based on the arguments of counsel and relevant law, this [c]ourt finds the use of the term "alleged victim" is appropriate. The parties should refer to the victim in this case as the "alleged victim," "Ms. Allen," or "Kimberly Allen."

During voir dire, the State referred to Ms. Allen as "victim" seven times before defense counsel asked to approach. The following dialogue occurred during the bench conference:

DEFENSE COUNSEL: Judge, I think there was a motion taken up previously not to address the victim by the victim. And I think the [c]ourt instructed it was proper to address the victim by the alleged victim.

THE COURT: Okay. I did make that ruling previously that we need to address the people by who they are.

STATE: Okay. I'm sorry, Judge.

THE COURT: And address the victim as alleged. Okay.

STATE: I'll try to do better.

THE COURT: All right. Thank you.

The first question the prosecutor asked potential jurors following the bench conference was:

STATE: Okay. We've talked about the fact that this is a domestic violence case. I'm sure everybody has heard a little bit about it in the news, and you have heard that sometimes *victims* in domestic violence cases either don't want to prosecute or go back to the people that commit crimes against them. Is anyone going to say, well, if *this victim* ever did anything like that, I don't care about this case? Does anyone think that even if the *victim* talks to a person or goes back to a person that's committed a crime against them, that means a crime didn't occur? Does anyone think that that's necessarily the case? I mean, obviously, you all know you're going to have to listen to everything and make a decision based on everything that you hear. You know, all the facts and circumstances and what everyone says. But I want to make sure that no one is just going to completely disregard the evidence just if you hear that *the victim* might have been uncooperative at some point, recanting or minimizing this case. Will you all be open-minded?

(emphasis added).

At least two of the four references to "victim" above appear to be references to Ms. Allen. The prosecution continued to refer to Ms. Allen as "victim" throughout the trial. Our review of the record shows that the prosecution referred to Ms. Allen as "victim" seven times during voir dire before defense counsel objected, ten times during voir dire after the bench conference, seven times during its direct examination of witnesses, twice during the cross-examination of Defendant, once in response to an objection, and thirteen times during closing argument, for a total of forty times. This number excludes the times the prosecution used "victim" or "victims" in a general sense when not referring to Ms. Allen.

In light the trial court's pretrial ruling and ruling during the bench conference, it is difficult to excuse the conduct of the prosecutors in disregarding the trial court's rulings as a simple mistake repeated forty times. Although there were no "curative measures" announced to the jury concerning the prosecution's referring to Ms. Allen as victim, the trial court did instruct the jury that "[v]ictim means the person alleged to have been subjected to criminal conduct." We determine that the prosecutors' numerous references

to Ms. Allen as "victim" were improper. Standing alone, this conduct, more probably than not, did not affect the verdict to the prejudice of Defendant and did not constitute reversible error. *Judge*, 539 S.W.2d at 344; Tenn. R. App. P. 36(b). However, we will revisit this issue when we address cumulative error later in the opinion.

## 2. Improper Closing Arguments

Defendant claims that the prosecution argued facts not in evidence and improperly gave an opinion as to the truth or falsity of the testimony of certain witnesses. Defendant did not make a contemporaneous objection to any of the arguments he claims were improper. "Ordinarily, counsel must object contemporaneously to a perceived improper argument." *State v. Banks*, 271 S.W.3d 90, 132 (Tenn. 2008). We determine that this issue is waived based on Defendant's failure to raise a contemporaneous objection. *See State v. Jordan*, 325 S.W.3d 1, 58 (Tenn. 2010). Because Defendant does not argue that the State committed plain error, we will not address this issue for plain error. Defendant is not entitled to relief.

## D. Cross-Examination of Detective Fait

Defendant sought to question Detective Fait about the reasons he was no longer employed with the SPD. The State objected pursuant to Rule 608 of the Tennessee Rules of Evidence claiming that the reasons Detective Fait retired did not involve acts of untruthfulness. Following a jury-out examination of Detective Fait, the trial court limited Defendant's cross-examination to questions that would elicit answers from Detective Fait that he chose to retire rather than be terminated for conduct unbecoming of an officer and for mishandling evidence in a different case, but not the specific acts Detective Fait committed.

A defendant's right to confront witnesses does not preclude a trial court from imposing limits upon the cross-examination of witnesses, taking into account such factors as "harassment, prejudice, issue confusion, witness safety, or merely repetitive or marginally relevant interrogation." *State v. Reid*, 882 S.W.2d 423, 430 (Tenn. Crim. App. 1994); *see also* Tenn. R. Evid. 611(a) (stating that the trial court has authority to "exercise appropriate control over the presentation of evidence and conduct of the trial when necessary to avoid abuse by counsel[]"). A defendant's right to confront and cross-examine witnesses also "does not mean that a defendant has a right to present irrelevant evidence." *State v. Sheline*, 955 S.W.2d 42, 47 (Tenn. 1997). Absent a clear abuse of discretion that results in manifest prejudice to the defendant, this court will not interfere with the trial court's exercise of its discretion on matters pertaining to the examination of witnesses. *State v. Johnson*, 670 S.W.2d 634, 636 (Tenn. Crim. App. 1984) (citing *Monts*

*v. State*, 379 S.W.2d 34 (Tenn. 1964)). The trial court did not abuse its discretion by restricting the cross-examination of Detective Fait.

### E. Switching Tables

Defendant claims the trial court erred in making Defendant and his counsel switch tables after the jury pool had already seen them sitting at one table. "It is axiomatic that a trial judge should exercise care not to express any thought that might lead the jury to infer that the judge is in favor of or against the defendant in a criminal trial." *Caughron*, 855 S.W.2d at 536. The trial court has a duty to conduct the trial fairly and impartially. *Bean v. Bailey*, 280 S.W.3d 798, 805 (Tenn. 2009). The Tennessee Rules of Criminal Procedure are to be construed to secure "simplicity in procedure;" "fairness in administration;" and "the elimination" of "unjustifiable expense and delay" and "unnecessary claims on the time of jurors." Tenn. R. Crim. P. 2. The court has the power to adopt practices and procedures reasonably designed to secure simplicity, fairness, and expediency. The broad discretion granted to the trial court includes control of seating arrangements for parties, counsel and witnesses. *Com. v. Schwartz*, 233 A.2d 904, 916 (1967). We find nothing in the record to support a conclusion that the trial court abused its discretion as to the seating arrangements during the trial. In *State v. Rice,* our supreme court cited to an opinion of the Supreme Court of Washington, *State v. Johnson*, 462 P.2d 933, 935 (1969), which "held that the seating arrangement whereby the defendant and his counsel sat at the counsel table farthest from the jury box during voir dire did not prejudice the defendant and was not an abuse of the trial court's discretion." 184 S.W.3d 646, 675 (Tenn. 2006).

The trial court specifically referred to the local custom and practice in Rutherford County that the party with the burden of proof sits at the table closest to the jury. Although this custom and practice does not necessarily cover all cases, it provides a process designed to secure simplicity, fairness, and expediency in most cases and avoids possible delays and confusion that could result in a race to see which party could claim the table closest to the jury first. The trial court did not abuse its discretion in requiring Defendant to comply with the local practices and customs of the court. Defendant is not entitled to relief.

### F. Sufficiency of the Evidence

Because we determine that the State's suppression of obviously exculpatory information violated Defendant's right to a fair trial, we find the sufficiency of evidence claim pretermitted.

## G. Cumulative Error

"The cumulative error doctrine exists to protect a criminal defendant's state and federal constitutional right to a fair trial." *State v. Herron*, 461 S.W.3d 890, 909 (Tenn. 2015). The doctrine recognizes that there may be many errors committed in trial proceedings, each of which constitutes mere harmless error in isolation, but "have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." *State v. Hester*, 324 S.W.3d 1, 76 (Tenn. 2010). To warrant review under the cumulative error doctrine, there must have been more than one actual error during the trial proceedings. *Id.* at 77. We determine that the prosecutors' flagrant and repeated use of "victim" to refer to Ms. Allen was improper, and when added to the prosecution's *Brady* violation, it denied Defendant the right to a fair trial. We reverse on cumulative error and remand for a new trial.

## III. Conclusion

The State's failure to furnish obviously exculpatory information before the preliminary hearing, coupled with the death of Ms. Allen, the State's key witness, before Defendant had an opportunity to cross-examine Ms. Allen about the veracity of the emails, violated Defendant's right to a fair trial. In addition, the prosecutors' repeated use of "victim" in violation of the trial court's order resulted in reversible cumulative error. We reverse Defendant's convictions and remand for a new trial in which Ms. Allen's preliminary hearing testimony shall not be allowed as evidence.

_____
ROBERT L. HOLLOWAY, JR., JUDGE